F. R. OSBORNE, PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

1. A state can not tax or regulate interstate commerce, or make the payment of a tax or the taking out of a license a condition precedent to carrying on interstate commerce. A state statute which does so, either expressly or in effect, is offensive to the commerce clause of the Constitution of the United States, and void at least to that extent. The same is true as to foreign commerce.

2. A state statute which imposes a tax, in general terms, on the doing of specified kinds of business, or the pursuit of designated occupations, in the state, and requires that a license shall be taken out before any such business or avocation shall be done or engaged in, should not be construed to apply to any business of the kind that may constitute interstate commerce, but only to business that is domestic or state commerce and to persons engaged or intending to engage in such domestic or state business.

3. Although interstate commerce can not be taxed or regulated by state legislation, and the commerce clause of the Federal Constitution exempts all such commerce from regulation or taxation by state authority, yet the doing of business that constitutes interstate commerce by a person who is also at the same time engaged in business, of the same kind, that constitutes state or local commerce, can not be made a bar or exemption of the local or state commerce business from taxation or regulation by state authority.

4. The ninth section of the general revenue law of 1893 (Chapter 4115, approved June 2nd, 1893), provides that no person shall engage in or manage the business, profession or avocation mentioned therein without first taking out a state license as provided therein and paying the occupational tax and license fee prescribed thereby; and it authorizes counties and incorpor-

porated cities and towns to impose further taxes. As to express companies its special provisions, substituting figures for words, are as follows: "All express companies doing business in this State shall pay in cities of fifteen thousand inhabitants or more, a license tax of $200; in cities of ten thousand to fifteen thousand inhabitants, $100; in cities of five to ten thousand inhabitants, $75; in cities of three thousand to five thousand inhabitants, $50; in cities of one thousand to three thousand inhabitants, $25; in towns and villages of less than one thousand and more than fifty inhabitants, $10." Any express company violating these provisions, or any person that knowingly acts as agent for any express company before it has paid the tax payable by such company is guilty of a misdemeanor, and punishable as therein provided: *Held*, (a) The act does not tax or regulate or apply to interstate commerce, as distinguished from state or local commerce carried on by an express company, but applies only to express business that is local or state commerce.

(b) That so long as an express company confines its operations to express business that constitutes interstate or foreign commerce it is exempt from the above legislation, but if it engages in business that is state or local, as distinguished from interstate or foreign commerce, it becomes subject to the statute, notwithstanding it may at the same time engage in interstate or foreign commerce.

(c) The effect of the section, in so far as it imposes license taxes on express companies, is that each company doing any business that constitutes local or state commerce, as contradistinguished from interstate or foreign commerce, shall pay a state license tax and take out a state license when it proposes to do business in any city or town or village having more than fifty inhabitants, the amount of such tax being as above indicated according to the population. When there are in one county several cities or towns or villages belonging to one or more of the stated classes, the company must take out a separate state license for each city, town or village it may intend to do business in, and pay the tax and the fee for the same. Any county may require each company doing business within its limits to pay, for doing business in any city, town or village in the county and within the provisions of the act, a license tax not exceeding fifty per cent. of the amount paid the State for doing business in such city, town or village. And any incorpora-

ted city or town may impose a tax of as much as fifty per cent. of the state tax on any company doing business therein.

(d) That the amount of the tax is not shown to be prohibitory or destructive of the business of the express companies, even if it be that any judicial action could be based on such a showing.

(e) The act is of uniform operation throughout the State as to all persons standing in the situation made the test of such taxation.

(f) The ascertainment of population involved in the act is not one that the courts are incapable of dealing with successfully.

Writ of Error to the Circuit Court for Duval county.

*John E. Hartridge* for Plaintiff in Error.

*The Attorney-General* for Defendant in Error.

### STATEMENT.

Section 9 of Chapter 4115 of the Laws, approved June 2, 1893, provides that "no person shall engage in or manage the business, profession or occupation mentioned in this section, unless a state license shall have been procured from the tax collector, which license shall be issued to each person on receipt of the amount hereinafter provided, together with the county judge's fee of twenty-five cents for each license, and shall be signed by the tax collector and the county judge, and have the county judge's seal upon it. Counties and incorporated cities and towns may impose such further taxes of the same kind upon the same subjects as they may deem proper, when the business, profession or occupation shall be engaged in within such county, city or town. The tax imposed by such city, town or county shall not exceed fifty per cent. of the

state tax. But such city, town or county may impose taxes on any business, profession or occupation not mentioned in this section, when engaged in or managed within such city, town or county. No license shall be issued for more than one year, and all licenses shall expire on the first day of October of each year, but fractional license, except as hereinafter provided, may be issued to expire on that day at a proportionate rate, estimating from the first day of the month in which the license is so issued; and all licenses may be transferred, with the approval of the Comptroller, with the business for which they were taken out, when there is a *bona fide* sale and transfer of the property used and employed in the business as stock in trade; but such transferred license shall not be held good for any longer time, or for any other place, than that for which it was originally issued.''

The same section, in various sub-divisions, then enumerates divers business occupations and professions that are required to procure licenses, and prescribes the amount of tax that each shall annually pay therefor, until we reach the twelfth sub-division of the section, that provides, among other things, that ''all express companies doing business in this State, shall pay in cities of fifteen thousand inhabitants or more, a license tax of two hundred dollars; in cities of ten thousand to fifteen thousand inhabitants, one hundred dollars; in cities of five thousand to ten thousand inhabitants, seventy-five dollars; in cities of three thousand to five thousand inhabitants, fifty dollars; in cities of one thousand to three thousand inhabitants, twenty-five dollars; in towns and villages of less than one thousand and more than fifty inhabitants, ten dollars. Any express company violating this provision, and any person that knowingly acts as agent for any express

company before it has paid the above tax, payable by such company, shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine of not less than fifty dollars, or confined in the county jail not less than six months." Besides the criminal penalty above, Section 10 of the same act provides that "the payment of all license taxes may be enforced by the seizure and sale of the property by the collector." For an alleged violation of this statute, in knowingly acting as agent at Jacksonville, in Duval county, Fla., for the Southern Express Company, a corporation created under the laws. of the state of Georgia, but doing business in Florida without having paid such license, F. R. Osborne, the plaintiff in error, was arrested upon affidavit and warrant, and required to give bond for his appearance before the Criminal Court of Record for Duval county to answer said charge. Upon his refusal to give such bond he was committed to the common jail of the county, there to await trial, whereupon he applied to the judge of the Circuit Court for the writ of habeas corpus to test the legality of his arrest and detention. Upon the hearing on habeas corpus the arrest and detention of the plaintiff in error on the charge alleged against him under this statute were adjudged to be legal, and he was remanded to the custody of the sheriff, and this order he brings here for review by writ of error.

The cause was submitted to the court below upon the following agreed statement of facts: "That the said F. R. Osborne is the agent of the Southern Express Company, and that said company is a corporation created, existing and being under the laws of the state of Georgia. That said Southern Express Company is doing a business in the State of Florida ordi-

narily done by express companies in the United States,. of carrying goods and freight for hire from points within the State of Florida to points in said State, and also of carrying goods and freight for hire from points within the State of Florida to points without the State of Florida, in other states, in divers parts of the United States, and in carrying goods and freights for hire from points in other states of the United States to points within the State of Florida, and that it has been engaged in such business for more than 20 years, and was so engaged on the 3rd day of October, 1893. That of the business done by the Southern Express Company, 95 per cent. thereof consists of traffic carrying of goods and freights from the State of Florida into other states, and bringing and carrying from other states of the United States to points within the State of Florida, and 5 per cent. thereof consists of carrying goods and freights between points wholly within the State of Florida. That F. R. Osborne did knowingly act as the agent of said express company on the 3rd day of October, 1893, in the city of Jacksonville, Duval. county, Florida, a city having more than 15,000 inhabitants, the said Southern Express Company having then and there failed and refused to pay the license tax, as required by Article 12, Section 9, of an act entitled 'An act for the assessment and collection of revenue,' of the Laws of Florida approved June 2, 1893. That the Southern Express Company does business in, and has agents in, more than one town in nearly every county in the State, and that said towns differ in population, and that it has an office and agent and does business in Polk county, Florida, in the following incorporated towns, with a population as follows: Bartow, 1,500 inhabitants; Ft. Meade, 600 inhabitants; Columbia, 600 inhabitants; Lakeland, 800 inhabitants,

and Winter Haven, 200 inhabitants. In Orange county: Apopka, 500 inhabitants; Orlando, 10,000 inhabitants; Sanford, 5,000 inhabitants; Umatilla, 3,000 inhabitants; Winter Park, 600 inhabitants, and Zellwood, 300 inhabitants. In Alachua county: Campville, 400 inhabitants; Archer, 150 inhabitants; Grove Park, 110 inhabitants; Gainesville, 5,000 inhabitants; Hawthorne, 300 inhabitants; High Springs, 500 inhabitants, and Island Grove, 200 inhabitants. In Duval county: Jacksonville, with a population of over 15,000; Baldwin, 125 inhabitants.''

RANEY, C. J. :

In the case of Osborne vs. Mobile, 16 Wall., 479, decided in 1872, the ordinance then in question provided that every express and railroad company doing business in the city of Mobile, Ala., and having a business extending beyond the limits of that state, should pay an annual license of a stated amount, and every such company doing a business within the limits of the state, and every such company doing business within the city, should take out license, paying therefor other amounts. Osborne was there, as here, the agent of the Southern Express Company, a Georgia corporation, which transacted a general express business within, and extending beyond, the state of Alabama. The company fell under the first clause of the ordinance, and, notwithstanding its terms, that clause was held unobjectionable to the commerce clause of the Federal Constitution. The decision is founded expressly on the rule laid down in the case of the State Tax on Railway Gross Receipts, 15 Wall., 284, where it was said that it is not everything which affects commerce that amounts to a regulation of it, within the meaning of the Constitution, and was also admitted

that the ultimate effect of the tax on such receipts might be to increase the cost of transportation, but was held that the right to tax the receipts, though derived in part from interstate transportation, was within the general authority of the state to tax persons, property, business or occupations within their limits. In Philadelphia Southern Steamship Co. vs. Pennsylvania, 122 U. S., 326, the decision in the case of the State Tax on Railway Gross Receipts was considered and questioned; it being held by a unanimous court that a state tax upon the gross receipts, of a steamship company incorporated under its laws, such receipts being derived from the transportation of persons and property by sea between different states, and to and from foreign countries, was a regulation of interstate and foreign commerce, and in conflict with the exclusive powers of Congress. That the Osborne case has been overruled by that of Leloup vs. Port of Mobile, 127 U. S., 640, decided in 1888, can not be denied, and it is clear that the first clause of the ordinance did in terms and effect impose a tax on that class of express companies which might be engaged in interstate commerce, as a distinct class from the other classes engaged, one in business not extending beyond the state, and the other in that not extending outside of the corporate limits.

In the Leloup case, *supra*, an ordinance adopted in 1883 imposed an annual license tax of $225 "on telegraph companies." Leloup was the agent of the Western Union Telegraph Company at Mobile, and the license tax not having been paid, a civil action was brought in the Circuit Court against Leloup to recover a pecuniary penalty which had been adjudged in another tribunal under the ordinance for its violation;

the complaint in the Circuit Court alleging that the company was a New York corporation, having a place of business at Mobile, and had been engaged there, in the business of transmitting telegrams from and to points within Alabama, and between private individuals of that state, as well as between citizens thereof and of other states. The plea alleged, in substance, Leloup's agency, and that the company's charter authorized it to construct and operate lines of telegraph in and between the various states of the Union, including Alabama; and further, that on June 5, 1867, the company accepted the restriction and obligations of the act of Congress of July 24, 1866, and that in accordance with its charter, the act of Congress, and agreements with the railroad companies, it constructed, and was, at the time of the alleged breach of the ordinance, maintaining and operating its lines of telepraph on various specified public railroads leading into Mobile, and through Alabama and several other named states, and into others, and over all the principal railroads, post roads, and military roads in the United States, said roads being public highways, and the daily mails being regularly carried thereon under authority of law and the direction of the Postmaster-General, and under and across navigable streams in said states, but without interruption to navigation of the streams, or travel on such military and post roads. That before and during the year 1883 it had been, and still was, engaged in the business of sending and receiving telegrams over such lines for the public between its office in Mobile and other places in other states and territories of the United States, and to and from foreign countries, also in sending telegraphic communications between the several departments of the government of the United States and.

their officers and agents, giving priority to said official telegraphic communications over all other business, such official communications being sent at rates fixed by the Postmaster-General annually since June 5, 1867. To this plea there was a demurrer, which was sustained by the circuit court, and judgment was given for the plaintiff, and this judgment affirmed by the Supreme Court of Alabama. The Supreme Court of the United States reversed the judgment, and decided (1) that the license tax imposed by the ordinance was purely a tax on the privilege of doing the business in which the telegraph company was engaged, the company being also required to pay taxes on its property as other corporations and individuals, and also a tax on its gross receipts within the state; (2) stating that the question was squarely presented whether a state, as a condition of doing business within its jurisdiction, may exact a license tax from a telegraph company, a large part of whose business is the transmission of messages from one state to another, and between the United States and foreign counties, and which is invested with the powers and privileges conferred by the act of Congress of July 24, 1866, and other acts incorporated in Title 65 of the Revised Statutes. Proceeding to answer this question, it held that a state can not tax a business occupation when it can not tax the business itself, and that a tax on the occupation of doing a business is a tax on the business; that communication by telegraph is commerce, as well as in the nature of postal service, and, if carried on between different states, it is commerce among the several states, and directly within the power of regulation conferred upon Congress, and free from the control of state regulations, except such as are strictly of a police character. In reply to the argu-

ment that a portion of the company's business was internal to the state, and therefore taxable by the state, it is said that such fact does not remove the difficulty; that the tax affects the whole business without discrimination; and that there are sufficient modes in which the internal business, if not already taxed in some other way, may be subjected to taxation, without the imposition of a tax which covers the entire operations of the company. The cases of Pensacola Tel. Co. vs. W. U. Tel. Co., 96 U. S., 1, and W. U. Tel. Co. vs. Texas, 105 U. S., 460, are also referred to approvingly, and the conclusion reached in Leloup's case is declared to be plainly within the principles of the decisions in Robbins vs. Shelby County Taxing Dist., 120 U. S., 489, and Philadelphia & S. Steamship Co. vs. Pennsylvania, 122 U. S. 326, and the case is held to be parallel with that of Brown vs. Maryland, 12 Wheat., 419; and the court declares that the fairest and most just construction of the Constitution in all its parts "leads to the conclusion that no state has the right to lay a tax on interstate commerce in any form, whether by way of duties laid on the transportation of the subjects of that commerce, or on the receipts derived from that transportation, or on the occupation or business of carrying it on; and the reason is that such taxation is a burden on that commerce, and amounts to a regulation of it, which belongs solely to Congress."

It will be well to notice here the cases of Pensacola Tel. Co. vs. W. U. Tel. Co. and of W. U. Tel. Co. vs. Texas, referred to *supra*. The former case is one in which it was held that the above act of Congress, in so far as it declares that the erection of telegraph lines shall, as against state interference, be free to all who accept its terms and conditions, and that a telegraph

company shall not, after accepting them, be excluded by another state from prosecuting its business within her jurisdiction, is a legitimate regulation of commercial intercourse among the states, and appropriate legislation to execute the powers of Congress over the postal service, and is not limited in its operation to such military and post roads as are upon the public domain. This act, it will be found, gives to all telegraph companies organized under the laws of any of the states the right to construct telegraph lines through and over any portion of the public domain of the United States, and over and along any of the military and post roads of the United States, and over and across the navigable streams and waters of the United States, with certain conditions as to construction; and grants the right to occupy land and use materials; and enacts that telegraphic communications between the several departments of the general government and their officers and agents shall, in their transmission over the lines of such companies, have priority over all other business, and be sent at rates to be annually fixed by the Postmaster-General; and also enacting that, before any company shall exercise the powers and privileges conferred thereby, it shall file its written acceptance with the Postmaster-General of the restrictions and obligations required by this act. And in W. U. Tel. Co. vs. Texas, where a Texas statute required every chartered telegraph company doing business in that state to pay a tax of one cent on every full-rate message, and one-half cent for every message less than full rate, the state sued to recover the tax for messages, of which a large number were sent to places outside of the state, and by officers of the general government on public business. There was judgment for the state; no deductions being allowed by the state courts for

messages sent out of the state, or by government officers on government business. The Supreme Court of the United States, in reversing the judgment, says: "The * * * company having accepted the restrictions and obligations of this provision by Congress, occupies, in Texas, the position of an instrument of foreign and interstate commerce, and of a government agent for the transmission of messages on public business. Its property in the state is subject to taxation the same as other property, and it may undoubtedly be taxed in a proper way on account of its occupation and its business. The precise question now presented is whether the power to tax its occupation can be exercised by placing a specific tax on each message sent out of the state, or sent by public officers on the business of the United States. * * * As such, so far as it operates on private messages sent out of the state, it is a regulation of foreign and interstate commerce, and beyond the power of the state. That is fully established by the cases already cited. As to the government messages, it is a tax by the state on the means employed by the government of the United States to execute its constitutional powers, and therefore void." The conclusion was that the judgment, in so far as it included taxes for government messages or those sent out of the state, was erroneous; it being observed that any tax which the state might put on messages sent by private parties, and not by the agents of the general government, from one place to another exclusively within the jurisdiction of the state, will not be repugnant to the Federal Constitution, and that whether the stated law of Texas, in its present form, could be used to enforce the collection of such a tax, was a question entirely within the jurisdiction of the courts of the state, and as to which the Supreme Court

had no power to review. Still another case involving
the effect of the act of Congress referred to above, and
tending also to elucidate the question before us, in-
dependent of such legislation, is W. U. Tel. Co.
vs. Massachusetts, 125 U. S., 530. The valua-
tion of the entire capital stock of the company
was obtained from the company, and from this there
were made certain deductions allowable in determin-
ing the assessable value of such entire stock, and the
value of the property of the company in the state was
ascertained upon the basis of the proportion of the
length of the lines within the state to the length of its
lines throughout the country, and this value was as-
sessed at the uniform rate of $14.14 on each $1,000 of
valuation. The company contended that in view of
the act of Congress, which it had accepted, no tax
could be claimed for that part of its line—2,334.55 out
of 2,833.05 miles—that was over, under, or across post
roads. The Massachusetts law had a provision to the
effect that upon a failure to pay the taxes required to
be paid to the treasurer, he might commence an action
for the recovery of the same, and further, that all
penalties denominated by the act might be collected
by informations, and that upon such information the
court might issue an injunction restraining the further
prosecution of business by the corporation, company,
copartnership, or association until all such taxes due,
or penalties incurred, should be paid, with interest
and costs. The tax was held by the Supreme Court to
be essentially an excise on the capital of the corpora-
tion, imposed in an attempt by the commonwealth to
ascertain the just amount which any corporation en-
gaged in business within its limits should pay as a
contribution to the support of its government on the
amount and value of the capital employed by the com-

pany therein; or, as elsewhere said, the tax, though nominally upon the shares of the capital stock, is, in effect, a tax upon that organization on account of property owned and used by it in the state, and the proportion of the length of its lines in the state to their entire length throughout the whole country is made the basis for ascertaining the value of that property. While, says the opinion, the state could not interfere by any specific statute to prevent a corporation from placing its lines along these post roads, or stop the use of them after they were placed there, nevertheless the company receiving the benefit of the laws of the state for the protection of its property and its rights is liable to be taxed upon its real and personal property, as any other person would be; and that it never could have been intended by Congress, in conferring upon a corporation of one state the authority to enter the territory of another and erect its poles and lines therein, to establish the proposition that such a company owed no obedience to the laws of the state into which it thus entered, and was under no obligation to pay its fair proportion of the taxes necessary to its support. The tax was held to be valid, but that part of the state legislation which authorized an injunction was decided to be void; the court observing that the effect of the injunction was to utterly suspend the business of the company and defeat its operations within the state; that if Congress had authority to say that the company might construct and operate its telegraph over these lines, the state can have no authority to say it can not be done; but that in holding this portion of the act to be void, it was not meant to deprive the state of the power to assess and collect the tax.

In Crutcher vs. Kentucky, 141 U. S. 47, a statute of Kentucky made it unlawful for any agent of

any express company not incorporated by the laws of that state to carry on the business of transportation in that state without first obtaining a license therefor from the Auditor; and before the Auditor could issue such license to any agent of any company incorporated by any state of the United States, there had to be filed with such officer a copy of the company's charter, and a sworn statement showing the assets and liabilities of the company, amount of capital stock, how paid, and of what the assets of the company consist, and, in short, the financial condition of the company, and that it was possessed of $150,000, either in cash or safe investments, inclusive of stock notes, such statement to be renewed annually. A fee of $5, to be paid by the company or agent was allowed to the Auditor for issuing the license, and a like fee for filing copy of charter, and of ten dollars for filing original and annual statements. Crutcher was indicted for doing business as the agent of the United States Express Company, an express company not incorporated by the laws of Kentucky, but trading and doing business as a common carrier, by express, of goods and other things of value in and through the county of Franklin and state of Kentucky without having any license so to do, either for himself or for such company, and on a plea of not guilty was found guilty, and sentenced to pay a fine. There was an agreed statement of facts, including in its admissions the agency, the incorporation, and absence of license, and the doing of business ordinarily done by express companies in this country, of carrying goods and freight for hire, not only between points in the state, but also from points in the state to points out of it, and *vice versa*. The statement also showed

12

the total amount of business done at the Frankfort office in November, 1888, and that not quite one-fourth of it was local to the state, and the balance was between places in the state and places outside of it. The court of appeals of Kentucky affirmed the judgment of conviction; but the Supreme Court of the United States reversed it, and, in doing so, said of the statute that it required from the agent of every express company a license before he can carry on any business for the company in the state, and that this of course embraced interstate business as well as business confined wholly within the state, and was a prohibition against the carrying on of interstate business without a compliance with the state law. The requirement of the statement as to $150,000 investment is also held to be a regulation of such commerce in its application to corporations or associations engaged in that business, and a subject belonging to the jurisdiction of the national, and not the state legislature. "If," says the opinion, "a partnership firm of individuals should undertake to carry on the business of interstate commerce between Kentucky and other states, it would not be within the province of the state legislature to exact conditions on which they should carry on their business, nor to require them to take out a license therefor. To carry on interstate commerce is not a franchise or a privilege granted by the state; it is a right which every citizen of the United States is entitled to exercise under the Constitution and laws of the United States; and the accession of mere corporate facilities, as a matter of convenience in carrying on their business, can not have the effect of depriving them of such right unless Congress should see fit to interpose some contrary regulation on the subject." In citing Pickard vs. Pullman Southern Car Co., 117

U. S. 34, and other cases, observes the opinion, the court has frequently decided that a state law is unconstitutional and void which requires a party to take out a license for carrying on interstate commerce, no matter how specious the pretext may be for imposing it. Again, the court, addressing itself to the fact that the statement shows some business of a purely domestic character to have been done, says: "This is probably quite as much for the accommodation of the people of that state as for the advantage of the company; but, whether so or not, it does not obviate the objection that the regulations as to license and capital stock are imposed as conditions on the company's carrying on the business of interstate commerce, which was manifestly the principal object of its organization. These regulations are clearly a burden and restriction on that commerce. Whether intended as such or not, they operate as such; but taxes or license fees, in good faith imposed exclusively on express business carried on wholly within the state, would be open to no such objection." The opinion also distinguishes the case from those of foreign corporations seeking to do a business which does not belong to the regulating power of Congress, as insurance business and manufacturing, and all other corporations whose business is of a local and domestic nature, as to all of which the state has full power to prescribe the conditions of their doing such business in its limits. Bank of Augusta vs. Earle, 13 Pet., 519; Paul vs. Virginia, 8 Wall., 168; Liverpool Ins. Co. vs. Massachusetts, 10 Wall., 566; Cooper Manufacturing Co. vs. Ferguson, 113 U. S., 727; Philadelphia Fire Ass'n vs. New York, 119 U. S., 110. The act was held null and void as applied to the case of Crutcher.

The case of Maine vs. Grand Trunk Ry. Co., 142 U. S., 217, cited by the Attorney-General, holds, as the same is summarized in the syllabus, that a statute which requires *every* corporation, person, or association *operating a railroad within the state* to pay an annual tax *for the privilege of exercising its franchises therein*, to be determined by the amount of its gross transportation receipts, and further provides that when applied to a railroad lying partly within, and partly without the state, or to one operated as a part of a line or system extending beyond the state, the tax shall be equal to the proportion of the gross receipts in the state, to be ascertained in the manner provided by the statute, does not conflict with the Constitution of the United States, and the tax thereby imposed upon a foreign corporation operating a line of railway partly within, and partly without the state, is one within the power of the state to levy. By the terms of the statute passed in 1881 it was provided that "every corporation, person or association, operating any railroad in this state, shall pay to the State Treasurer for the use of the state an annual excise tax for the privilege of exercising its franchises in this state. * * *" The named railway company was a Canadian corporation having its place of business at Montreal. Its railroad in Maine had been constructed by a Maine corporation, whose charter authorized it to construct and operate a railroad from Portland to the boundary of the state, and with the permission of New Hampshire and Vermont it constructed a railroad from that city to a point in Vermont. In 1853 the Maine company leased its rights and privileges to the Canadian company, which, since then, had operated the road and used its franchises. The manner of ascertaining the amount of the tax was as follows: The

amount of gross transportation receipts for the year ending September 30th preceding the levying of the tax was to be divided by the number of miles of railroad operated, to ascertain the gross receipts per mile, and the tax was to be fixed on a scale of percentage varying according to the average receipts per mile, not to exceed, in any event, a stated per centum; and when a road lay partly within, and partly without the state, or was operated as a part of a system extending beyond the state, the gross transportation receipts of the railroad line or system over its whole extent within and without the state were to be divided by the total number of miles operated, to obtain the gross receipts per mile, and the gross receipts in the state were to be taken to be the average gross receipts per mile, multiplied by the number of miles operated within the state. The Supreme Court held the tax to be an excise tax upon the corporation for the privilege of exercising its franchises within the state of Maine, and it is said in the opinion that the privilege of exercising the franchises of a corporation within a state is generally one of value, and often of great value and the subject of earnest contention, and that as the granting of the privilege rests entirely in the discretion of the state, whether the corporation be of domestic or foreign origin, it may be conferred upon such conditions, pecuniary or otherwise, as the state in its judgment may deem most conducive to its interest and policy, and it may require the payment into its treasury each year of a specific sum, or may apportion the amount exacted according to the value of the business permitted, as disclosed by its gains or receipts of present or of past years; and further, that the erroneous ruling of the lower court, to the effect that the tax in question was a regulation of interstate

and foreign commerce, was founded upon the assumption that a reference by the statute to the transportation receipts, and adopting a certain percentage of the same for determining the amount of the excise tax, was in effect the imposition of the tax upon such receipts, and therefore an interference with interstate and foreign commerce, whereas the resort to the stated methods was not an interference with transportation, domestic or foreign, over the road of the railroad company, or any regulation of commerce consisting in such transportation; and there being no levy by the statute on the receipts themselves, either in form or fact, they constituting merely the means of ascertaining the value of the privilege conferred. The case is assimilated by the court to that of Home Ins. Co. vs. New York, 134 U. S., 594, where a portion of the capital stock of the company was invested in bonds of the United States, and by an act of the legislature of New York it was declared that certain classes of companies, with certain exceptions, incorporated under the laws of that state, or of any other state or country and doing business in New York, should be subject to a tax on its corporate franchise or business, to be computed at a varying percentage on its capital stock, according as its dividends thereon should be more or less, or there should be no dividend, as stated in the act. The company resisted the payment of the tax, asserting that it was one upon the capital stock of the company, and that consequently there should be deducted from the amount of the tax a sum bearing the same ratio thereto that the amount invested in government bonds, which were exempt from taxation, bore to its capital stock, and that the law requiring a tax without such reduction was unconstitutional and void. It was held, however, that the tax was not on the cap-

ital stock, nor upon any bonds of the United States composing a part thereof, but upon the corporate franchise or business of the company, and that reference was only made to the stock and dividends for the purpose of determining the amount of the tax to be exacted each year.

In 1879 the legislature of Pennsylvania enacted a statute to the effect, as far as it need be stated, that no foreign corporation, except insurance companies, that did not invest and use its capital in that commonwealth, should have an office or offices therein for the use of its officers, stockholders, agents or employes, unless it should have first obtained from the Auditor-General an annual license so to do, and for such license pay into the state treasury annually one-fourth of a mill on each dollar of capital stock that it was authorized to have, such payment to be made before the license could issue. This statute has been before the Supreme Court of the United States in the case of Pembina Mining Company vs. Pennsylvania, 125 U. S., 181, and in Norfolk & Western R. R. Co. vs. Pennsylvania, 136 U. S., 114. In the former case it appeared merely that the appellant company, a corporation organized under the laws of Colorado for the purpose of carrying on a general mining and milling business in that state, with its principal office there, had an office in the city of Philadelphia, Pa., for the use of its officers, stockholders, agents and employes, and not having complied with the law, an action was brought to recover of it the tax and penalty authorized by the statute. The tax was sustained by the Supreme Court of the United States as not in conflict with the commerce clause of the Constitution; and Judge Field, speaking for the court, said of the statute that it imposed no prohibition upon the transportation into Pennsyl-

vania of the products of the corporation or upon their sale in the commonwealth, but exacted only a license tax from the corporation when it has an office in the commonwealth for the use of its officers, stockholders, agents or employes; and it is also observed by him that the only limitation upon the power of a state to exclude a foreign corporation from doing business within its limits, or hiring officers for that purpose, or to exact conditions for allowing it to do business or have offices there, arises where the corporation is in the employ of the Federal government, or where its business is strictly commerce, interstate or foreign; that the control of such commerce, being in the Federal government, is not to be restricted by state authority. In the second case there was a different state of facts. The road of the railroad company, a corporation existing under the laws of Virginia and West Virginia, though entirely within the two states named, was a link in a through line of railroad by which passengers and freight were carried into Pennsylvania from other states, and from that state to other states; and it kept its office in Philadelphia for its stockholders, officers, agents and employes for the "furtherance of its business interests in the matter of its commercial relations," and did not "exercise or seek to exercise any privilege or franchise not immediately connected with interstate commerce, and required for the purposes thereof." The Pennsylvania courts held that the company was subject to the tax imposed by the statute, but the Supreme Court of the United States decided that the office was maintained because of the necessities of the interstate business of the company, and for no other purpose, and that a tax upon the company was therefore a tax upon one of the means or instrumentalities of the company's interstate

commerce, and as such was in violation of the commerce clause of the Constitution.

In McCall vs. California, 136 U. S., 104, the appellant was an agent in the city and county of San Francisco for the New York, Lake Erie & Western Railroad Company, a railroad corporation having its principal place of business in Chicago, and operating a continuous line of road between Chicago and New York; and as such agent his duties consisted in soliciting passenger traffic in that city and county over such road. He did not sell tickets to passengers over that or any other road, but took the passengers to the Central Pacific Railroad Company, where tickets were sold them. The only duty he was required to perform for such company was to induce people who contemplated taking a trip east to be booked over the line he represented, he neither receiving nor paying out any money or other valuable consideration on account thereof. An ordinance of San Francisco prescribed certain rates of license, and, among others, "for every railroad agency, twenty-five dollars per quarter," and made any violation of the ordinance a misdemeanor. McCall was convicted by the state court upon the above state of facts and the further circumstance that he had not complied with the ordinance. The tax was exacted of him as a condition precedent to carrying on the business. "It is admitted," said the opinion of the Supreme Court of the United States, reversing the state court, that "the travel which it was his business to solicit was not from one place to another within the state of California. His business therefore as a railroad agent, had no connection, direct or indirect, with any domestic commerce between two or more places within the state. His employment was limited exclusively to inducing persons in the state of California

to travel from that state into and through other states to the city of New York." The conclusion was, the business of the agent was interstate commerce, and that the tax was forbidden by the Federal organic law.

In Pullman Car Co. vs. Pennsylvania, 141 U. S., 18, the decision was that a state statute imposing a tax on the capital stock of all corporations engaged in the transportation of freight or passengers within the state, under which a corporation of another state engaged in running railroad cars into, through and out of the state, and having at all times a large number of such cars within the state, is taxed by taking as a basis of assessment such proportion of its capital stock as the number of miles of railroad over which its cars are run within the state bears to the whole number of miles in that and other states over which its cars are run, does not, as applied to such a corporation, violate the interstate commerce provision of the Federal Constitution. In the opinion of the court, by Judge Gray, it is said, citing Moran vs. New Orleans, 112 U. S., 69; Pickard vs. Pullman Southern Car Co., 117 U. S., 34; Robbins vs. Shelby County Taxing Dist., and Leloup vs. Mobile, *supra*, that much reliance was placed by the plaintiff in error upon the cases in which it has been decided that citizens or corporations of one state can not be taxed by another state for a license or privilege to carry on interstate or foreign commerce within its limits, and is then observed that in each of those cases the tax was not on the property employed in the business, but upon the right to carry on the business at all, and was therefore held to impose a direct burden on the commerce itself.

In Robbins vs. Shelby County Taxing Dist., 120 U. S., 489, a Tennessee statute enacted that "all drum-

mers and all persons not having a regular licensed
house of business in the taxing district offering for sale
or selling goods, wares or merchandise therein, by
sample, shall be required to pay to the county trustee
the sum of $10 per week or $25 per month for such
privilege, and no license shall be issued for a longer
period than three months." Robbins, according to
the agreed statement of facts, was a citizen and resi-
dent of Cincinnati, Ohio, and was engaged in the tax-
ing district of Shelby county, Tennessee, in the busi-
ness of drumming—soliciting trade by the use of sam-
ples—for the firm of Rose, Robbins & Co., doing busi-
ness at Cincinnati, all the members thereof being citi-
zens and residents of Cincinnati, for which firm he
worked as a drummer, the firm being engaged in the
selling of paper and other articles used in the book
stores of the stated taxing district. Robbins was ar-
rested for drumming in the district without a license.
There was judgment against Robbins, and on appeal
it was affirmed by the Supreme Court of Tennessee,
from which court the case was carried to the Supreme
Court of the United States, where the judgment was
reversed on the ground that the legislation, in so
far as it applied to cases like that under consideration,
was a regulation of commerce among the states, and
unconstitutional. In Ficklen vs. Shelby County Tax-
ing Dist., 145 U. S., 1, Ficklen and Cooper & Co. were
respectively commercial agents or brokers having an
office in the district, and in 1887 took out licenses for
their said business under a statute of Tennessee, which
provided that "every person or firm dealing in cotton
or any other article whatever, whether as factor,
broker, buyer, or seller, on commission or otherwise,
$50 dollars per annum, and in addition every such
person or firm shall be taxed *ad valorem* ten cents on

every hundred dollars of amount of capital invested or used in such business.   *     *     * And provided further, that if the person or persons taxed in this subsection have no capital invested they shall pay $2\frac{1}{2}$ per cent. on their gross year commissions, charges or compensation for said business, and at the time of taking out said license they shall give bond to return said gross commissions, charges or compensation to the trustee at the end of the year, and at the end of the year they shall make return to said trustee accordingly and pay him the said $2\frac{1}{2}$ per cent." During the year for which they took out licenses all the sales negotiated by Ficklen were made on behalf of principals residing in other states, and the goods so sold were at the time of the sale in other states, to be shipped to Tennessee as sales should be effected. During the same time at least nine-tenths of the commissions of Cooper & Co. were derived from similar sales. They had no capital invested in their business. At the expiration of the stated year they applied for a renewal of their license for 1888, tendering each the tax and fee therefor, but, as they had made no return of their commissions, and no payment of the per centage on their commissions, the application was denied. Thereupon they filed a bill to restrain the collection of the per centage tax for the past year, and also to restrain any interference with their current business, claiming that the tax was a tax on interstate commerce. The Supreme Court of the United States held that if the tax could be said to affect interstate commerce in any way, it did so incidentally, and so remotely as not to amount to regulation of it; and that under the circumstances the complainants could not resort to the court simply on the ground that the authorities had refused to issue a new license without the payment of the stip-

ulated tax.   Speaking here for all the court, except
Harlan, J., who dissented, there being, however, one
vacancy, Chief Justice Fuller said of the Robbins
case, *supra*, that the question involved there was, in
the language of Judge Bradley, who wrote the opinion
of the court, "whether it is competent for a state to
levy a tax or impose any other restrictions upon the
citizens or inhabitants of any other state for selling or
seeking to sell their goods in said state before they are
introduced therein;" and that it was decided that it
was not, yet that it was conceded that commerce
among the states might be legitimately incidentally
affected by state laws when they, among other things,
provided "for the imposition of taxes upon persons re-
siding within the state, or belonging to its population,
and upon avocations and employments pursued
therein, not directly connected with foreign or inter-
state commerce, or with some other employment or
business exercised under authority of the Constitution
and laws of the United States." That in Robbins' case
the tax was held in effect not to be a tax on him, but
on his principals, while in the Ficklen case it was
clearly levied upon the parties in respect of the gen-
eral commission business they conducted, and their
property engaged therein, or their profits realized
therefrom.   "No doubt," he further says, "can be en-
tertained of a right of a state legislature to tax
trades, professions and occupations in the ab-
sence of inhibition in the state Constitution,
and where a resident citizen engages in general
business subject to a particular tax, the fact
that the business done chances to consist for the time
being wholly or partially in negotiating sales between
resident and nonresident merchants of goods situated
in another state does not necessarily involve the taxa-

tion of interstate commerce, forbidden by the Constitution." Referring to what was said in Lyng vs. Michigan, 135 U. S., 161, 166, he observes, but here the tax is not laid on the occupation or business of carrying on interstate commerce, or exacted as a condition of doing any particular commission business, and that the complainants voluntarily subjected themselves thereto in order to do a general business. And as to Wiggins Ferry Co. vs. East St. Louis, 107 U. S., 365, where an annual license fee was imposed on a ferry company by the city of East St. Louis, Ill., the company having been chartered by that state, and being domiciled in the city, but its boats plying between there and St. Louis, Mo., he quotes from the opinion therein as follows: "The exaction of a license fee is an ordinary exercise of the police power by municipal corporations. When, therefore, a state expressly grants to an incorporated city, as in this case, the power to 'license, tax, and regulate ferries,' the latter may impose a license tax on the keepers of ferries, although their boats ply between lands lying in two different states, and the act by which this exaction is authorized will not be held to be a regulation of commerce." And of McCall vs. California, *supra*, he says that the decision was because the business of the agency was carried on with the purpose to assist in increasing the amount of passenger traffic over the road, and was therefore a part of the commerce of the road, and hence of interstate commerce. And of Philadelphia Steamship Co. vs. Pennsylvania, 122 U. S., 326, he remarks that the specific gross receipts were taxed as such, taxed "not only because they are money, or its value, but because they were received for transportation." Referring to Maine vs. Grand Trunk Ry. Co., *supra*, he says, since a railroad com-

pany engaged in interstate commerce is liable to pay an excise tax according to the value of the business done in the state, ascertained as it was there, it is difficult to see why a citizen doing a general business at the place of his domicil should escape payment of his share of the burdens of municipal government because the amount of his tax is arrived at by reference to his profits. "This tax is not on the goods, * * nor on non-resident merchants, and if it can be said to affect interstate commerce in any way, it is incidentally, and so remotely as not to amount to a regulation of such commerce. * * * What position they would have occupied if they had not undertaken to do a general commission business, and had taken out no license therefor, but had simply transacted business for non-resident principals, is an entirely different question, which does not arise on this record."

The present case is also clearly distinguishable from Pickard vs. Pullman Car Co., 117 U. S., 34, where a Tennessee statute imposing a privilege tax of $50 per annum on every sleeping car or coach used or run over a railroad in that state, and not owned by the railroad on which it should be run or used, was held void in so far as it applied to interstate transportation of passengers carried over railroads in Tennessee into or out of or across that state in sleeping cars owned by a corporation of another state, and leased by it for transportation purposes to Tennessee railroad corporations, the latter receiving the transit fare and the former the compensation for the sleeping accommodations. In the opinion it is said: "The car was equally a vehicle of transit as if it had been a car owned by the railroad company, and the special conveniences or comforts furnished to the passenger had been furnished by the railroad company itself. As such vehicle of transit

the car, so far as it was engaged in interstate commerce, was not taxable by the state of Tennessee, because the plaintiff had no domicil in Tennessee, and was not subject to its jurisdiction for purposes of taxation, and the cars had no situs within the state for purposes of taxation, and the plaintiff carried on no business within the state in the sense in which the carrying on of business in a state is taxable by way of license or privilege." Here the express company has, as is well known, its local officers and local agents throughout the state, and is doing business as personally here, and enjoying the protection of our government and laws over that business as much as any person in the state.

The statute now before us is clearly distinguishable from those involved in many of the preceding decisions. It does not impose any tax upon the value of the property of the company within the state, assessed either upon the principle adopted by the legislatures of Massachusetts and Pennsylvania in the cases of Western Union Tel. Co. vs. Massachusetts and Pullman Car Co. vs. Pennsylvania, or otherwise. Nor does it impose a tax on the mere right to exercise within the state a corporate franchise, estimating the value of such use, as in Maine vs. Grand Trunk Railway Co. Again, it is not a tax on a corporation for merely having an office in the state for the use of its officers, stockholders, agents or employes, as in Pembina Mining Co. vs. Pennsylvania; in all of which cases the statutes were sustained; nor one where the state had given exclusive right to a domestic corporation, and the question of the validity of that grant to the exclusion of another company which the act of Congress gave the right to enter the same territory, and constituted a Federal agency, as in Pensacola Tel.

Co. vs. Western Union Tel. Co., where the efficiency of the state grant to exclude the latter company was denied. Our statute is clearly one in which the tax is imposed on the person, and for doing the business of an express company. It is an occupational tax, and is not imposed on any corporation because it is a corporation, or for exercising its corporate franchise within the state, but it is imposed, as are most of the occupational taxes to be found in the act, on any and every person, whether natural or artificial, who may do the express business, and simply because of doing such business. It is moreover entirely clear that the statute does not anywhere show any intent to tax interstate or foreign commerce as such, or to tax any one because of doing business that constitutes interstate or foreign commerce, as contradistinguished from local business. That a state cannot tax interstate commerce, either directly or otherwise, or that it cannot make the payment of a tax or the taking out of a license a condition precedent to carrying on interstate commerce, we do not deny; nor do we wish to be understood as meaning that a state tax which in effect burdens such commerce wherever it may be carried on, although not laid directly or expressly on interstate commerce, is not offensive to the commerce clause of the Constitution, still we do believe that a state tax imposed on any avocation generally, such as those usually imposed on merchants, druggists, dealers in tobacco, and others, for doing business in the state, is not itself, nor is the statute imposing it, unconstitutional. That the commerce clause of the Constitution exempts from the burden of state taxation those who confine themselves to interstate commerce is a truth of which, at this day, knowledge must be im-

puted to the law-making power of the states, and in
the absence of language that clearly connects such an
intent with that power, it should not be held that there
was a purpose to ignore such truth or violate its prin-
ciples; but that the doing of express or other business
which constitutes interstate commerce along with and
as a part of a general business, which is also made up
in part of business of the same nature that is local to
the state, exempts those engaged in such general bus-
iness from the tax which the law imposes upon it, we
do not admit.   Of course, where such statutes make
the payment of the tax or the taking out of a license
a condition precedent to such general business, they
are never a bar to any one at any time entering upon
or doing interstate commerce business, and as long as
any one does only such business he is exempted by the
commerce clause from the effect of the statute, and is,
in our judgment, placed beyond the intent of the
mere general language usually adopted in imposing
occupational taxes; but when he does not confine him-
self to such business, but engages indiscriminately in
local and interstate business, he cannot, by making
the former a feature of that business, relieve himself
from the taxes, conditions or regulations to which the
latter subjects him.   Engaging in the former business
does not necessitate his engaging in the latter, and if
he does not engage in the latter the former is in no
wise burdened, or even affected, by the tax or the stat-
ute, but, on the contrary, he is as free to carry on in-
terstate commerce unaffected by the provisions of this
act as if it was not on the statute book.   He may, if
he chooses, keep his local and interstate business en-
tirely distinct, or carry them on each as a separate
business, and if he does so, the former will be subject
to state taxation and regulation, but the latter will be

exempt from any legislation regulating or burdening the former. In our judgment, it was never the purpose of the commerce clause to interfere with state taxation or state regulation of taxation so long as any regulation of interstate or foreign commerce or commerce with the Indian tribes is not interfered with.

It is obvious from several of the decisions cited above that there is a clear distinction between the unconstitutionality of a statute as such, or of a specific provision thereof, tested by the commerce clause, and the application of a general provision like that before us, of a statute to interstate commerce business; which, but for the commerce clause, would be within the operation of such general provision. This is illustrated by the case of the Pembina Mining Co., and that of the Norfolk & Western R. R. Co., involving the Pennsylvania statute as to foreign corporations having offices in the state for the use of officers and others. In the former of these cases, where the imposition of the tax was sustained, it was said, and is evident, that the statute proposed no prohibition upon the transportation of the products of the corporation or upon their sale in the state, nor is there in the statute anything that shows an intent to affect interstate commerce as such in any way, but when it was attempted to subject to that statute a company which was using its offices solely for interstate commerce purposes, and the state court had decided both that the statute applied to offices so used, and that the tax as thus applied was not contrary to the commerce clause, the Supreme Court reversed the decision, and held that, as so applied, the tax was unconstitutional. Again, in the McCall case, where it is made prominent that the business of the agent was exclusively interstate in its character, it is entirely plain that it was not the

meaning of the court that the statute or ordinance in-
volved in these cases did not stand in full force and
effect as to everything except interstate or other com-
merce falling within the terms of the commercial
clause. And in the case of Western Union Tel. Co.
vs. Texas, where telegrams sent between persons in
Texas and those in other states and those sent to gov-
ernment officers were held to be exempted from the
general provision of the act *taxing all messages*, the
former because they were interstate commerce, and
the latter because of the character of the company as
a governmental agency, it is apparent that telegrams
themselves were the subject of taxation by the terms
of the act, and those which were held to be exempt
were purely interstate or governmental in their char-
acter. Again, it is shown in the Shelby County Tax-
ing District cases. In one of them (Robbins' case)
the facts showed nothing but interstate com-
merce business, pure and simple; there being not
a fact in it that makes the decision authority be-
yond the inability to tax such commerce as such.
Of course, no one would pretend to say that it
committed the court to the view that in the doing of a
general business of a particular character composed of
both interstate and local commerce, the former compo-
nent would relieve the entire business from a state tax
or regulation to which it would be subject if there was
no such component, or that the act was not entirely ef-
fectual except as to business covered by the commerce
clause. In the Ficklen case, however, the tax was, as
it was imposed by the statute, as general as it was in the
Robbins case, and yet because the parties had submit-
ted themselves to the statute as persons intending to
do a general business, or, in other words, one indis-
criminate as to local or interstate commerce, it was

held that they could not, either because in the one case only interstate business was done, and in the other mostly such business, and only one-tenth of local business, evade the provisions of the statute. We do not understand any case to hold that the protection of the commerce clause is confined to citizens of other states than that whose legislation is complained of. It is as much a shield to the Floridian who in Florida is doing such business with those in other states as it is to the Georgian residing in Georgia who may be engaging in business with residents of Florida; the protection is to all interstate commerce.

We are not unmindful of the seeming conflict to these views to be found in the expressions embodied in the Leloup and the Crutcher cases, but our judgment is that those expressions are to be viewed with reference to the circumstances under which the Supreme Court of the United States was then speaking. The state courts which it was reviewing had each declared in effect that these statutes were binding upon and effectual as to companies as doers of interstate business, or, in other words, were a bar to their doing interstate business without having complied with their requirements. Port of Mobile vs. Leloup, 76 Ala., 401; Crutcher vs. Commonwealth, 89 Ky., 7. This construction has become, in so far as the Federal tribunals were concerned, binding upon the Federal court as to the effect of each statute within the state enacting it, as much as if it had been expressly stated in the act. Pullman Car Co. vs. Pennsylvania, 141 U. S., 18, 21. This being so, the doing of local business could not affect the question. It gave to the statute the same effect on interstate commerce as if it had had a special clause as to such commerce, like the first clause of the Alabama statute in the case of Osborne

vs. Mobile, *supra*, which decision we regard, in view of that clause, as entirely overthrown by the subsequent decisions of the same tribunal. It can not be, where the state statute does not interfere with interstate commerce, but it can be carried on protected by the state courts against regulation or interference by state authority, that the mere fact that state commerce, if carried on, is regulated or burdened, operates as a regulation of or burden on interstate commerce.

It is not to be doubted that, under our statute, any citizen of the State, or of any other state, or any body corporate of either, that should enter upon the express business in this State, proposing to confine itself to local or state business, or actually doing so, would be subject to all the provisions of this statute; and we can not see how it can be that an engagement by any such person, natural or artificial, in local business can be relieved from the provisions of the statute by an engagement at the same time in interstate commerce business, or how his engagement in the latter business can make the statute inapplicable to the other. Is it true that the merchant who may be doing a large local business can exempt himself from the statute by the fact that he may also do a regular business with customers in other states, to whom he sells and ships goods? We do not think that anything but interstate and foreign business, or business with the Indian tribes, is protected by the clause in question, or that that clause is the basis either for interfering with a state's dominion over its own commerce, or for prescribing the mere form of its legislation as to its affairs.

Our state statute can have no effect as to any interstate or foreign commerce business which may be car-

ried on by the Southern Express Company, the principal of the plaintiff in error, or by him as its agent, or in fact by any one. So long as he and the company confine their operations to express business constituting interstate or foreign commerce, they are exempt from any interference with them under state legislation. Such commerce is the subject of Federal regulation, and is beyond the jurisdiction of state authority. That the Southern Express Company is engaged in such commerce is admitted, and that it is engaged in domestic or state commerce is also admitted; and nothing is clearer than that the right to engage in interstate or foreign commerce, freed from any regulation or burden of the same by the states, gives no immunity from state regulation or state taxation of state commerce. The exclusion of state interference in the one case is no more perfect nor any more essential than the exclusion of Federal interference in the other. In our judgment, the Florida statute now under consideration is, in so far as its terms can be construed to apply to interstate or foreign commerce, of no effect; and besides this there is in the act, in so far as it applies to express companies, nothing that necessarily regulates or that burdens or interferes with anything that is strictly interstate or foreign commerce, or that in view of the commerce clause of the Federal Constitution, should or can properly be construed to apply to interstate or foreign commerce. Any person or persons or body corporate wishing to engage in the express business, and confine that business to interstate or foreign commerce, can do so, and any effort to apply to or enforce against him the provisions of the statute as to license, license tax or license fee must prove futile. The commerce clause of the Constitution of the United States protects him.

:against any such interference. But because such person or persons or body corporate may have this right, he or they have not, as an incident to it, the right to engage in state commerce, and the statute, as a regulation of state commerce, is entirely valid. It is a legal regulation of state commerce, and there is nothing in the Federal Constitution that exempts any person or persons, natural or artificial, from its provisions.

If the person engaging, or proposing to engage in interstate commerce express business, finds that to engage in express business which is state commerce will or may take some of his interstate commerce express earnings to pay the license taxes and fees of the state commerce business, he has only to refrain from the latter business to avoid incurring such exaction from such earnings. It is undeniable that taxes on property employed in interstate commerce business do not constitute a regulation of such commerce, (Maine vs. Grand Trunk Ry. Co., and Western Union Tel. Co. vs. Massachusetts, *supra*, and Pullman Car Co. vs. Pennsylvania, 141 U. S., 18); and this must be true, notwithstanding that the payment of such taxes can not be met from the earnings of state or local commerce. It is not sufficient to constitute a regulation of such commerce that the thing complained of affects it indirectly, incidentally and remotely. Sherlock vs. Alling, 93 U. S., 99, 102; Smith vs. Alabama, 124 U. S., 465; Railroad Co. vs. Penniston, 18 Wall., 5, 30, 31.

II. We fail to discover any uncertainty or obscurity in the statute as to the sums required by it to be paid by express companies as a state license tax, or, we may add, as a county or a city or town license tax. The obvious meaning of the act, in so far as its provisions relate to these companies, is that each company shall

pay a state license tax, and take out a state license, when it proposes to do business in any city or town or village having more than fifty inhabitants; the amount of such state license tax being $200 for cities of fifteen thousand or more inhabitants, and $100 for cities of from ten to fifteen thousand inhabitants, $75 for cities of from five to ten thousand, $50 for those of from three to five thousand, $25 for those of from one to three thousand, and $10 for towns and villages of more than fifty inhabitants. Where there are in one county several cities or towns or villages belonging to one or more of these classes, the company must take out a separate state license for each one of them that it may intend to do business in, and pay the tax and fee for the same as stated. It of course takes out no license for any city, town or village that it does not do business in. Any county may impose on a company doing business within its limits a license tax of not more than fifty per cent. of the state tax, and thus require the company to pay it not more than 50 per cent. of the amount such company has to pay to the state as a license tax for doing business at any city, town or village, within the provisions of the act. If one company is doing business in, say, three places, one of which belongs to one class, another to another class, and the third to still another, the county may impose a tax on the company for each of the three places, not exceeding fifty per cent. of the amount of the state tax for that place. Likewise, any incorporated city or town may impose on any such company doing business within its limits a municipal license tax not exceeding fifty per cent. of the state license tax imposed upon it for that place by the statute. Whether or not this construction of the statute will result in rendering it impossible for express compa-

nies to carry on within our borders business that is local to the State, is a consideration for the law-making power, but it can not be invoked properly to influence a construction that is contrary to the plain meaning of the statute, made more palpable still by a comparison of it with former legislation as to the same matter. Acts of 1872, p. 37; 1881, p. 26; 1891, p. 8. By the legislation cited, the tax was imposed first on the agents, and afterwards changed to the companies, the tax on the companies being confined to simply a state tax, payable to the State Treasurer, without any license from collectors of revenue, or any county or municipal taxation under the general provisions of the license tax section of the statutes; while now the state tax is payable to the collectors of revenue, and the license is signed and delivered according to the general provisions of the ninth section of the revenue law of 1893, just as in the cases of many other, if not all, the occupations made subject to license by that section; its county and municipal taxation features being likewise applicable to these companies, just as they are to merchants, keepers of hotels, liquor dealers and banks, and others too numerous to designate. Upon most deliberate consideration, we are satisfied beyond doubt that any other construction of the act on this point would be strained and inconsistent, and contrary to its meaning and the manifest purpose exhibited by the statute. The amount of the tax, if not a matter solely of legislative discretion, is still not shown by this record to be prohibitory or destructive of business; and if there be one or more counties in the state in which there is not even a village of fifty inhabitants the fact does not bring the act in conflict with any provision of our Constitution, nor does it impair the uniform operation of the act throughout the State as

to all persons standing in the situation which the act makes the test of taxation. The question of the population of any city, town or village has, as the petition shows, presented no insuperable difficulty to petitioner or his counsel, nor, as is shown by the stipulation between counsel, any to the state authorities; and when it shall be made an issue, it will be one of fact, and not beyond the power of the courts to deal with successfully; and it is entirely clear, from the case before us, that the law affords a hearing as to the enforcement of the criminal features of the statutes, and it would be improper to intimate any opinion as to its provisions that give resort to levy and sale of property, when no such levy has been made.

It cannot be said that the detention of the plaintiff in error is without jurisdiction, and therefore he could or should have been discharged on habeas corpus from the custody in which he was when the writ issued. *Ex Parte* Prince, 27 Fla., 196, 9 South. Rep., 659. The plaintiff in error was properly remanded by the Circuit Judge for a hearing before the Criminal Court of Record of Duval county upon the charge. That hearing must be conducted on principles consistent with the conclusions we have reached, and particularly with an eye to the fact that our legislation has and can have no effect upon interstate commerce, but is applicable alone to state or local business. The Southern Express Company may carry on any and all business that constitutes interstate or foreign commerce, free from regulation by or under our laws; but business strictly of a state or local character cannot be exempted from our laws, or put beyond our authority, by its engaging at the same time in interstate or foreign commerce.

The judgment will be affirmed, and the cause remanded for proceedings not inconsistent with this opinion.