## PICKARD, Comptroller, *v.* PULLMAN SOUTHERN CAR COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE MIDDLE DISTRICT OF TENNESSEE.

Argued January 25, 26, 1886.—Decided March 1, 1886.

Section 6 of the act of the legislature of Tennessee, passed March 16, 1877, Laws of 1877, ch. 16, p. 26, which imposes a privilege tax of $50 *per annum* on every sleeping car or coach used or run over a railroad in Tennessee and not owned by the railroad on which it is run or used, is void so far as it applies to the inter-State transportation of passengers carried over railroads in Tennessee, into or out of or across that State, in sleeping cars

owned by a corporation of Kentucky and leased by it for transportation purposes to Tennessee railroad corporations, the latter receiving the transit fare, and the former the compensation for the sleeping accommodations.

Section 28 of Article II of the Constitution of Tennessee, of 1870, contains these provisions: "All property shall be taxed according to its value, that value to be ascertained in such manner as the Legislature shall direct, so that taxes shall be equal and uniform throughout the State. No one species of property from which a tax may be collected shall be taxed higher than any other species of property of the same value. But the Legislature shall have power to tax merchants, pedlers, and privileges, in such manner as they may from time to time direct."

On the 16th of March, 1877, the Legislature of Tennessee passed an Act, entitled "An Act declaring the mode and manner of valuing the property of telegraph companies for taxation, and of taxing sleeping cars," Laws of 1877, ch. 16, p. 26, the 6th section of which provided as follows: "That the running and using of sleeping cars or coaches on railroads in Tennessee, not owned by the railroads upon which they are run or used, is declared to be a privilege, and the companies owning and running or using said cars or coaches are required to report, on or before the 1st day of May of each year, to the comptroller, the number of cars so used by them in this State; and they shall be required to pay to the comptroller by the first of July following $50 for each and every of said cars or coaches used or as run over said roads; and if the said privilege tax herein assessed be not paid as aforesaid, the comptroller shall enforce the payment of the same by distress warrant."

Under this act the comptroller of the State claimed that there was due from the Pullman Southern Car Company, a corporation of Kentucky, to the State, for each of the years 1878, 1879 and 1880, a privilege tax of $50 on each one of thirty-eight sleeping cars, run and used on railroads in Tennessee, and not owned by the railroad companies on whose roads they were used, but owned by the Pullman Company. The aggregate amount of the taxes claimed was $5700, and the comptroller instituted proceedings to collect them from that company, which, under the provisions of a statute of the State, paid the

money under protest, and it was paid into the State treasury, with notice to the comptroller that it was. paid under protest, and the company, within the time prescribed by the statute, and in August, 1881, brought an action at law against the comptroller to recover the $5700, in the Circuit Court of the United States for the Middle District of Tennessee.

The declaration alleged, among other things, that the sleeping cars, for the running or use of which the taxes were claimed and collected, were not run or used by the plaintiff during any one of the years 1878, 1879 or 1880, but were run and used by certain railroad companies in Tennessee, though they were owned during that time by the plaintiff, which permitted those railroad companies to run and use them under certain contract stipulations; that the sleeping cars so run and used were, during the whole of the years 1878, 1879 and 1880, employed by them in inter-State commerce, being run into and through Tennessee, from and into other States, transporting passengers from other States into or across Tennessee, or from Tennessee into other States; and. that, therefore, such taxes and the collection thereof were illegal and contrary to the Constitution of the United States. There was a demurrer to the declaration, raising, among other things, the question above stated, but, on a hearing, the demurrer was overruled, the opinion of the court being delivered by Mr. Justice Matthews. 22 Fed. Rep. 276. The conclusion arrived at in the opinion, which accompanies the record, was that the levying of a privilege tax on the running and using, on railroads in Tennessee, of sleeping cars not owned by those railroads, was, as applied to. such cars when employed in inter-State transportation, a regulation of commerce among the States, and contrary to the Constitution of the United States, and, therefore, void. Leave being given to the defendant to plead over, *nil debet* was pleaded, and the issue was tried by the court without a jury, by a written stipulation between the parties, which embodied an agreed statement of facts, on which the cause was heard.

The agreed statement set forth that the plaintiff was a Kentucky corporation, having its chief office and place of business at Louisville; and that, since 1872, it had been engaged, at

Louisville, in manufacturing railway cars, known as drawing-room cars and sleeping cars, and in hiring those cars to various railroad companies in Tennessee and other States, under the following form of contract:

"This indenture, made this 19th day of June, A.D. 1872, between the Louisville and Nashville Railroad Company, the party of the first part, and the Pullman Southern Car Company, of the second part: Whereas, the said party of the second part is now engaged in the business of manufacturing railway cars, known as drawing-room and sleeping cars, under certain patents belonging to them, and of hiring the same to railroad companies, and receiving therefor income and revenue by the sale to passengers of seats and berths, and accommodations therein; and whereas the said party of the first part is desirous of availing itself of the use on and over its lines of road, of the cars constructed under the sleeping and drawing-room car patents now the property of said second party, and also of connections by means of said cars with other lines of railroad, whereon said cars are now operated by said second party, now this contract witnesseth: That the said party of the second part, in consideration of the covenants and agreements of the party of the first part, hereinafter mentioned to be by them kept and performed, hereby agrees with the said party of the first part, that they will furnish drawing-room cars and sleeping cars to be used by said party for the transportation of passengers, sufficient to meet the requirements of travel on and over their line of railroad, and on and over all lines of railroad which they now control, or may hereafter control, by ownership, lease, or otherwise, the said cars so furnished to be satisfactory to the general superintendent of the first party.

"2d. The said party of the second part agrees that they will keep the carpets, upholstery, and bedding of each of the said cars in good order and repair, and renew and improve the same, when necessary, at their own expense, excepting repairs and removals made necessary by accident or casualty; it being understood that the said first party shall repair all damages to said cars, of every kind, occasioned by accident or casualty, during the continuance of this agreement.

"3d. The said party of the second part hereby agrees, at their own expense and cost, to furnish one or more employés, as may be needful, upon each of said cars, whose duties shall be to collect fares for the accommodations furnished in said cars, and generally to wait upon passengers therein, and provide for their comfort.

"4th. The said party of the first part hereby agrees that the general officers of said second party, and the employés named in article third of this agreement, shall be entitled to free passage over the lines of the first party, when they are on duty for the second party.

"5th. The party of the second part hereby agrees that the general officers of the first party shall be entitled to free passes in any of the cars furnished by said second party under this agreement.

"6th. It is hereby mutually agreed, that the said employés of the second party named in article third of this agreement shall be governed by and subject to the rules and regulations of the said first party, which are, or may be, adopted from time to time, for the government of their own employés, and, in the event of any liability arising against said first party for personal injury, death, or otherwise of any employé of said second party, it is hereby distinctly understood and agreed, that the said first party shall be liable only to the same extent they would be if the person injured was an employé in fact of said first party, and for all liability in excess thereof shall be indemnified and paid by said second party.

"7th. The party of the first part, in consideration of the use of the aforesaid cars, hereby agrees to haul the same on the passenger trains on their line of road, and on all roads which they now control or may hereafter control by ownership, lease, or otherwise, and also on all passenger trains on which they may, by virtue of contracts or running arrangements with other roads, have the right to use such cars in such manner as will best accommodate passengers desiring the use of said cars; and the said party of the first part shall, at their own expense, furnish fuel for the cars and materials for the lights, shall wash and cleanse said cars, and shall also keep said cars in good

order and repair, including renewals of worn-out parts, and all things appertaining to said cars, necessary to keep them in first-class condition, except such as are provided for in article second of this agreement.

" 8th. The party of the first part agrees to furnish said party of the second part, at convenient points, room and conveniences for airing and storing bedding.

" 9th. The said party of the first part further agrees, that the said party of the second part shall be entitled to collect from each and every person occupying said cars, such sums for said occupancy as may be usual on competing lines furnishing equal accommodations, and that such rules and regulations shall be agreed upon as will most favor the renting of seats and couches in said cars.

" 10th. The party of the first part hereby agrees to permit the party of the second part to place their tickets for seats and couches for sale in such of the railroad ticket offices as may be desired by said second party, and such services shall be performed by and as part of the general duties of the ticket agents, and without charge to the party of the second part; proceeds of such sales to be at the risk of said second party.

" 11th. The party of the first part hereby agrees that said second party shall have the exclusive right, for a term of fifteen years from the date hereof, to furnish for the use of the first party drawing-room or parlor cars and sleeping cars, including reclining-chair cars, on all the passenger trains of said first party, and over their entire lines of railroad, and on all railroads which they may control, or may hereafter control, by ownership, lease, or otherwise, and also on all passenger trains on which they may, by virtue of contracts or running arrangements with other roads, have the right to use such cars, and that they will not contract with any other parties to run said class of cars on or over said lines of road during said period of fifteen years.

" The said second party, for the consideration aforesaid, hereby guarantees said first party against all damages of whatsoever kind which may be by said first party incurred in consequence of any infringement of patent rights in the construction and

· use of any of said cars which may be used by said second party upon the lines of said first party under this arrangement, it being the meaning and intent of this article, that the second party shall secure said first party against all manner of expenditures which may be incurred by said first party in consequence of any litigation connected with alleged infringements of patent rights for the interior arrangements of said cars, and that they will pay off and discharge all judgments obtained at any time against said first party on account of such infringements.

. "12th. It is mutually agreed between the parties hereto, that, in case either of said parties shall, at any time hereafter, fail to keep and perform any of the covenants herein contained to be by them respectively kept and performed, then, and in that case, after written notice shall have been given to the defaulting party thereto of the default complained of, if the said defaulting party shall refuse or neglect to make good, keep, and perform such unfulfilled covenants and conditions of this agreement within a reasonable time after such notice, the other party shall be at liberty to declare this contract ended ' and no longer in force."

The agreed statement further set forth, that the plaintiff had never had any branch office or establishment of any kind in Tennessee, unless the fact that the plaintiff had placed its tickets for sale with railway agents in that State constituted the offices of such agents branch offices or establishments of the plaintiff; that it had never had any ticket agents of its own in Tennessee, except in so far as the ticket agents of the railway companies with whom the tickets of the plaintiff had been placed for sale might be regarded as the agents of the plaintiff; that the plaintiff had never had any other agents, officers or employes in Tennessee, except the conductors and porters which it furnished with its cars under its contracts with the railroad companies; that the cars furnished by the plaintiff under those contracts constituted all the property owned by it in Tennessee, and the business done by it under those contracts, such as it was, was the only business done by it in Tennessee; that the cars furnished by it under those con-

tracts (with the exception of two sleeping cars running between Nashville and Memphis), were used in transporting passengers from other States into or across Tennessee, and from points in Tennessee to points in other States; that the same cars also transported passengers from points in Tennessee to other points in that State whenever they properly applied for such transportation, but the number of such passengers bore an inconsiderable proportion to the other passengers transported in those cars; that those cars ran into, out of or across Tennessee, making such stops as the trains to which they were attached made; that, in the case of passengers travelling across Tennessee, or from points out of it to points in it, their sleeeping-car tickets were purchased and paid for before they entered Tennessee, but in the case of passengers from points in Tennessee to points in other States, or in Tennessee, the tickets were purchased and paid for in Tennessee; that the railroad companies of Tennessee with whom such contracts were made were duly chartered by that State, or organized or operated under its laws, with power to transport passengers for hire; that they were taxed by that State on the value of their roads, rolling stock and other tangible property, and also on the value of their franchises; that from March 16, 1877, to the present time, the Memphis and Charleston Railroad Company, and the East Tennessee, Virginia and Georgia Railroad Company, both of them Tennessee corporations, had owned sleeping cars which they had run and used during that time as sleeping cars upon their respective roads, and they had not been required by the State to pay any tax for running or using said sleeping cars upon their roads, except in so far as such a tax might have been included in the tax assessed on the value of their franchises; and that the thirty-eight cars before mentioned included the two cars run between Nashville and Memphis.

The agreed statement set forth the other facts hereinbefore contained, necessary to a recovery; and, on the 29th of December, 1884, a judgment was entered, which stated that the cause was heard on an agreed statement of facts, and that it was thereby made a part of the record at large in the cause, and

that the court found the issue joined in favor of the plaintiff. It then set forth the material facts contained in the agreed statement, and awarded a judgment for $5400, for the taxes on the thirty-six cars, and for $1089.90 interest, and for costs, assigning as a reason that the State had no power to impose a privilege tax on the plaintiff for running or using the thirty-six cars in the State, the tax being a regulation of commerce between the States, and, therefore, a violation of the Constitution of the United States. To reverse this judgment the defendant sued out a writ of error.

*Mr. J. B. Heiskell* for plaintiff in error (*Mr. S. A. Champion* was with him on the brief), argued :

I. That all State questions had been eliminated by the decision in the case of *Pullman Southern Car Co.* v. *Gaines,* 3 Tenn. Ch. 587, and the only contentions now before this court were contained in the Federal questions involved. *Stone* v. *Wisconsin,* 94 U. S. 181, 183; *Fairfield* v. *County of Gallatin,* 100 U. S. 47, 52; *Burgess* v. *Seligman,* 107 U. S. 29, 34; *Railroad Co.* v. *Gaines,* 97 U. S. 697, 709.

II. That the fact that certain parts of attachments of the sleeping cars were patented could in no way interfere with the right of the legislature to levy a privilege tax upon the "running and using" of sleeping cars over the railroads in the State owned by foreign corporations and run for the accommodation of passengers into, out of or through the State.

III. That the contract between the Pullman Southern Car Company and the various railroad companies exhibited in the record, showed that the arrangement intended to be made with the railroad companies was to secure the privilege of running and using sleeping cars or coaches over the lines of the various railroads, and was not a contract of hiring or leasing cars by the railroad companies, and that the business was done by the defendants and not by the railroad companies.

IV. That the running and using of cars for sleeping purposes only, not owned by the railroads upon which they were run or used, was not such inter-State commerce, the regulation of which is placed by the Constitution of the United States under the

· control of Congress, nor did the regulation of this occupation such as was imposed by the privilege tax in question, interfere with transportation or commerce among the States. _Sinnot_ v. _Davenport_, 22 How. 227 ; _Gibbons_ v. _Ogden_, 9 Wheat. 1, 210–214 ; _Foster_ v. _Davenport_, 22 How. 244 ; _Crandall_ v. _Nevada_, 6 Wall. 35 ; _Osborne_ v. _Mobile_, 16 Wall. 479 ; _State Tax on Railway Gross Receipts_, 15 Wall. 284 ; _Wiggins Ferry Co._ v. _East St. Louis_, 107 U. S. 365 ; _Moran_ v. _New Orleans_, 112 U. S. 69 ; _Pullman Southern Car Co._ v. _Gaines_, 3 Tenn. Ch. 587 ; _Dun_ v. _Cullen_, 13 Lea, 202 ; _Lightburn_ v. _Taxing District_, 4 Lea, 219.

V. That a tax laid upon the instruments of commerce was not a tax upon commerce itself.

VI. That it is a well-settled rule, long adhered to by this court, that a construction given by State courts of last resort to legislative enactments and provisions of State constitutions, ought, as a rule, to be followed in the Federal courts ; and while this court is not necessarily governed by previous decisions of said courts upon the same or similar points, except where they have been so firmly established as to constitute a rule of property, yet unless the decision in question is held to be unreasonable, violative of some fundamental law or well-established principle, this court will be governed by the construction given by the Supreme Court of the State. _Railroad Co._ v. _Gaines_, 97 U. S. 697, 709 ; _Stone_ v. _Wisconsin_, 94 U. S. 181.

_Mr. Thomas L. Dodd_ on behalf of Davidson County for plaintiff in error.

_Mr. O. A. Lochrane_ and _Mr. E. S. Isham_ for defendant in error.

MR. JUSTICE BLATCHFORD delivered the opinion of the court. After stating the Case as above reported, he continued :

. The point upon which the final judgment was rendered in the case was the one considered and adjudged in the decision given on the demurrer to the declaration. The tax was not a property tax, because, under the Constitution of Tennessee, all property must be taxed according to its value, and this tax was

not measured by value, but was an arbitrary charge. What was done by the plaintiff was taxed as a privilege, it being assumed by the State authorities, that the Legislature had the power, under the Constitution of Tennessee, to enact the 6th section of the Act of 1877, and that the plaintiff had done what that section declared to be a privilege. By the decisions of the Supreme Court of Tennessee, cited in the opinion of the Circuit Court on the demurrer, it is held, that the Legislature may declare the right to carry on any business or occupation to be a privilege, to be purchased from the State on such conditions as the statute law may prescribe, and that it is illegal to carry on such business without complying with those conditions. In this case, the payment of the tax imposed was a condition prescribed, without complying with which what was done by the plaintiff was made illegal. The tax was imposed as a condition precedent to the right of the plaintiff to run and use the thirty-six sleeping cars owned by it, as it ran and used them on railroads in Tennessee. The privilege tax is held by the Supreme Court of Tennessee to be a license tax, for the privilege of doing the thing for which the tax is imposed, it being unlawful to do the thing without paying the tax. What was done by the plaintiff in this case, in connection with the use of the thirty-six cars, if wholly a branch of inter-State commerce, was made by the State of Tennessee unlawful unless the tax should be paid, and, to the extent of the tax, a burden was placed on such commerce; and, upon principle, the tax, if lawful, might equally well have been large enough to practically stop altogether the particular species of commerce.

What was that commerce? The plaintiff, by its contract, furnished sleeping cars to the railroad company, to be used by the latter "for the transportation of passengers," sufficient in numbers to meet the requirements of travel on the road. The plaintiff kept in order and renewed the carpets, upholstery and bedding of the cars, except repairs and renewals made necessary by accident or casualty, but all damages to the cars by accident or casualty were repaired by the railroad company. The plaintiff furnished employés on each car to collect fares for the accommodations furnished by the car, and to wait upon

passengers and provide for their comfort.   Those employés were governed by the rules adopted by the railroad company to govern its own employés, and the railroad company was liable for personal injury to, or the death of, any such employé of the plaintiff to the same extent only as if such employé was in fact an employé of the railroad company, and the latter was indemnified by the plaintiff for all liability in excess thereof. The railroad company carried free on its line such employés of the plaintiff and its general officers when on duty for it, and the plaintiff carried free in the cars it so furnished the general officers of the railroad company.   In consideration of the use of such cars, the railroad company hauled them on the passenger trains on its line, in such manner as best accommodated passengers desiring to use the cars, and furnished, at its own expense, fuel for them and materials for the lights, and washed and cleansed them, and kept them in good order and repair, including renewals of worn-out parts, and all things appertaining to them, necessary to keep them in first-class condition, with the exceptions before specified in regard to carpets, upholstery and bedding, and furnished room and conveniencies for airing and storing bedding.   The plaintiff collected from every person occupying the car compensation for its accommodations in seats and couches.   The railroad company permitted the plaintiff to place its tickets for seats and couches on sale in the ticket offices of the railroad company, the sale to be a part of the general duties of the ticket agents of the latter, and to be without charge to the plaintiff, but the proceeds of sales to be at its risk.   The contract was made an exclusive one for fifteen years, and the plaintiff agreed to protect the railroad company against all liability for the infringement of any patent in the construction and use of the cars, and there was a provision for the termination of the contract by either party on a breach of it by the other.

On these facts, the cars in question were cars for the transportation of the passengers who occupied them, in their transit into, or through, or out of Tennessee.   They were used by the railroad company for such transportation, and it received the transit fare or compensation.   For purposes of transit, it dealt

with the cars as it would with cars owned by itself. It hauled them, furnished fuel and materials for lights, washed and cleansed them, kept them in repair, renewed worn-out parts, repaired all damages to them by accident or casualty, and even repaired and renewed carpets, upholstery, and bedding damaged or destroyed by accident or casualty; all at its own expense, and without charge to the plaintiff; leaving to the plaintiff only to make good the ordinary wear and tear of the sitting and sleeping conveniencies, and allowing it to have the compensation for such conveniences, and furnishing it free of charge with all facilities for selling seats and couches.

The tax was a unit, for the privilege of the transit of the passenger and all its accessories. No distinction was made in the tax between the right of transit, as a branch of commerce between the States, and the sleeping and other conveniences which appertained to a transit in the car. The tax was really one on the right of transit, though laid wholly on the owner of the car. So, too, the service rendered to the passenger was a unit. The car was equally a vehicle of transit, as if it had been a car owned by the railroad company, and the special conveniencies or comforts furnished to the passenger had been furnished by the railroad company itself. As such vehicle of transit, the car, so far as it was engaged in inter-State commerce, was not taxable by the State of Tennessee; because the plaintiff had no domicil in Tennessee, and was not subject to its jurisdiction for purposes of taxation; and the cars had no *situs* within the State for purposes of taxation; and the plaintiff carried on no business within the State, in the sense in which the carrying on of business in a State is taxable by way of license or privilege.

The case of *Attorney-General* v. *London & North Western Railway Co.*, in the Court of Appeal, 6 Q. B. Div. 216, before Lord Chief Justice Coleridge, and Lord Justices Baggallay and Brett, affirming the judgment of the Exchequer Division, 5 Ex. Div. 247, is instructive in the above point of view, as to the subject in hand. There, the railway company attached to its night trains sleeping carriages for the accommodation of such of its first class passengers as might choose to avail them-

selves of it. For the use of these carriages they were charged an extra sum in addition to the ordinary first-class fare. Besides couches with pillows, sheets and blankets, each carriage contained a lavatory, and other conveniences. Passengers using such carriages were not disturbed during the night by demands for their tickets, and, if they arrived at their destination in the night, the passengers were allowed to remain in their beds until the morning. Under a statute imposing a percentage duty "upon all sums received or charged for the hire, fare or conveyance of passengers" on any railway, the Government claimed and was allowed the duty on the extra sum charged for the use of the sleeping carriage. The Court of Appeal, by Lord Coleridge, said: "We regard the additional accommodation afforded by the sleeping carriages as differing in no essential particular from the superior accommodation afforded by a second-class carriage over a third, or by a first-class carriage over both. If the company issued tickets to all passengers alike, at the price charged to passengers travelling in third-class carriages, and then issued tickets, at corresponding prices, to those desiring to travel in a higher class of carriage, it could hardly be contended that duty would not be payable upon the prices paid for such second ticket. The passenger who is content to travel in a third-class or second-class carriage in the day, might well desire to travel in a carriage of a higher class by night; and, in like manner, a passenger ordinarily travelling by day in a first-class carriage might desire the additional accommodation at night of a sleeping carriage. No separate charge is made in the present case; the charge, though written on a separate ticket, is, in our opinion, part of one charge for the conveyance of the passenger in a particular way, and is, therefore, a part of the charge for the conveyance of a passenger, received and charged for such conveyance." That case is in harmony with the views before taken in regard to the present case. The fare paid by the inter-State passenger to the railroad company, and that paid to the plaintiff, added together, were merely a charge for his conveyance in a particular way, and there was really but one charge for the transit, though the total amount paid was divided among two recipi-

ents. The service was a single one, of inter-State transit, with certain accommodations for comfort, and what was paid to the plaintiff was part of a charge for the conveyance of the passenger.

The views above expressed are in harmony with numerous decisions which have been made by this court on the subject to which they relate. In *Almy* v. *The State of California*, 24 How. 169, a stamp tax had been imposed by the State on bills of lading for the transportation of gold or silver from any point within the State to any point without it, and was held by this court to be invalid; and in *Woodruff* v. *Parham*, 8 Wall. 123, 138, it was said by this court, Mr. Justice Miller delivering its opinion, that that stamp tax " was a regulation of commerce, a tax imposed upon the transportation of goods from one State to another, over the high seas, in conflict with the freedom of transit of goods and persons between one State and another, which is within the rule laid down in *Crandall* v. *Nevada*, 6 Wall. 35, and with the authority of Congress to regulate commerce among the States."

In the *State Freight Tax Case*, 15 Wall. 232, 281, it was said that a State cannot tax persons for passing through or out of it; that inter-State transportation of passengers is beyond the reach of a State legislature; and that a tax upon it amounts to a tax upon the passengers transported.

In *Railroad Co.* v. *Maryland*, 21 Wall. 456, 472, Mr. Justice Bradley, in speaking for the court, said, that a State cannot impose a tax or duty on the movements or operations of commerce between the States, because it would be a regulation of such commerce "in a matter which is essential to the rights of all, and, therefore, requiring the exclusive legislation of Congress," being "a tax because of the transportation," and "therefore, virtually, a tax on the transportation."

The decisions in the various cases in this court on the subject of a tax by a State on the bringing in of passengers from foreign countries, and which are collected and commented on by Mr. Justice Miller, in delivering the opinion of this court in the *Head Money Cases*, 112 U. S. 580, 591, show it to be a settled matter that to tax the transit of passengers from foreign countries or between the States, is to regulate commerce.

The principles which governed the decisions in *Welton* v. *Missouri*, 91 U. S. 275, *Guy* v. *Baltimore*, 100 U. S. 434, and *Moran* v. *New Orleans*, 112 U. S. 69, holding unlawful the State taxes in those cases on inter-State commerce in merchandise, are equally applicable to the tax in this case on the transit of passengers. The rule which governs the subject is accurately and tersely stated by Mr. Justice Field, in delivering the opinion of the court, in *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, 211: " While it is conceded that the property in a State, belonging to a foreign corporation engaged in foreign or inter-State commerce, may be taxed equally with like property of a domestic corporation engaged in that business, we are clear that a tax or other burden imposed on the property of either corporation because it is used to carry on that commerce, or upon the transportation of persons or property, or for the navigation of the public waters over which the transportation is made, is invalid and void, as an interference with, and an obstruction of, the power of Congress in the regulation of such commerce." The case of *Telegraph Co.* v. *Texas*, 105 U. S. 460, in regard to a State tax on telegraphic messages sent out of a State, is a kindred case. The whole subject, in reference to a State tax imposed for selling goods brought into a State from other States, was recently fully considered by this court in *Walling* v. *Michigan*, 116 U. S. 446. And in that case Mr. Justice Bradley, speaking for the court, says: " We have also repeatedly held, that, so long as Congress does not pass any law to regulate commerce among the several States, it thereby indicates its will that such commerce shall be free and untrammeled." See *Welton* v. *Missouri*, 91 U. S. 275, 282; *Machine Co.* v. *Gage*, 100 U. S. 676, 678; *County of Mobile* v. *Kimball*, 102 U. S. 691, 697; *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, 204; *Brown* v. *Houston*, 114 U. S. 622, 631, where the cases on that point are collected.

It is urged that the decison of the Circuit court in this case was inconsistent with the rulings in *Osborne* v. *Mobile*, 16 Wall. 479, and in *Wiggins Ferry Co.* v. *East St. Louis*, 107 U. S. 365 It becomes necessary, therefore, to examine those cases.

In *Osborne* v. *Mobile*, Osborne was an agent, at Mobile, Ala-

bama, of a Georgia corporation, an express company, and, as such, transacted at Mobile a general express business within and extending beyond the limits of Alabama. An ordinance of the city of Mobile required an annual license fee of $500 to be paid by every express company doing business in Mobile, and having a business extending beyond the limits of Alabama, while every express company doing business within the limits of the State was required to pay a license fee of only $100, and every such company doing business within the city was required to pay a license fee of only $50. A fine was prescribed for a violation of the ordinance. Osborne violated it and was fined. The legality of the tax was upheld. Chief Justice Chase, in delivering the opinion of the court, cited the *State Freight Tax Case*, 15 Wall. 232, decided at the same term, as holding "that the State could not constitutionally impose and collect a tax upon the tonnage of freight taken up within its limits and carried beyond them, or taken up beyond its limits and brought within them; that is to say, in other words, upon inter-State transportation"; "because it was, in effect, a restriction upon inter-State commerce, which by the Constitution was designed to be entirely free." The tax on the Georgia Express Company was upheld as a tax "upon a business carried on within the city of Mobile." Osborne was a local agent, personally subject to the taxing jurisdiction of the State, as representing his principal, and the tax was on the general business he carried on, and the subject of the tax was not, as here, the act of inter-State transportation. In *Osborne* v. *Mobile*, the court drew the distinction between the case before it and the *State Freight Tax Case*. The present case falls within the latter.

In *Wiggins Ferry Co.* v. *East St. Louis*, the decision was that the State had power to impose a license fee, upon a ferry-keeper living in the State, for boats which he owned and used in conveying from the State passengers and goods across a navigable river to another State; and that the levying of a tax on such boats, or the exaction of a license fee in respect of them, by the State in which they had their *situs*, was not a regulation of commerce within the meaning of the Constitution. In the case at bar the plaintiff was not a Tennessee cor-

poration, and had no domicil in Tennessee, and the sleeping cars in question, as before said, had not any *situs* in Tennessee for the purposes of taxation.

The question involved in this case was before the Court of Chancery of Tennessee in *Pullman Southern Car Co.* v. *Gaines*, 3 Tenn. Ch. 587, on the same facts, as to the privilege tax for 1877. That court held (and it is stated that the Supreme Court of Tennessee, on appeal, affirmed its ruling), that this privilege tax, as to such of the cars as passed and repassed through the State, and did not abide in it, was not amenable to the objection that it interfered with inter-State commerce. The view taken was that the property of the foreign corporation, used in Tennessee, could be taxed as property or by an excise on its use; and that the tax in this case was not directly on the object of commerce, or directly aimed at commerce. We have given to the views set forth by the Tennessee Chancery Court the consideration due to the judgments of that tribunal, but are unable to concur in its conclusion.

*Judgment affirmed.*