Argued and submitted September 6, 1991, rules held valid July 22, Gilliam County's petition for reconsideration and Columbia Resource Company's petition for reconsideration denied November 4, both petitions for review allowed December 22, 1992 (315 Or 271)

GILLIAM COUNTY
and Oregon Waste Systems, Inc.,
*Petitioners,*

*v.*

DEPARTMENT OF
ENVIRONMENTAL QUALITY,
*Respondent.*

(CA A68441 (Control))

COLUMBIA RESOURCE COMPANY L.P.,
*Petitioner,*

*v.*

ENVIRONMENTAL QUALITY
COMMISSION,
*Respondent.*

(CA A68455)
(Cases Consolidated)

837 P2d 965

371-a

J. Laurence Cable, Portland, argued the cause for petitioners Gilliam County, Oregon, and Oregon Waste Systems, Inc. With him on the brief were James E. Benedict, Donald A. Haagensen, Hill, Huston, Cable, Ferris & Haagensen, Timothy V. Ramis, Jeff Bachrach, and O'Donnell, Ramis, Crew & Corrigan, Portland.

John A. DiLorenzo, Jr., Portland, argued the cause for petitioner Columbia Resource Company, L.P. With him on the brief was O'Connell, Goyak & DiLorenzo, Portland.

Robert M. Atkinson, Assistant Attorney General, Salem, argued the cause for respondents. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Buttler, Presiding Judge, and Rossman and De Muniz, Judges.

De MUNIZ, J.

## De MUNIZ, J.

Petitioner Oregon Waste Systems, Inc. (OWS), owns and operates a regional solid waste disposal facility known as the Columbia Ridge Recycling Center and Landfill. It is located southwest of Arlington in Gilliam County. OWS disposes of waste generated in Oregon and also waste generated outside of Oregon. The operation provides direct and indirect benefits to petitioner Gilliam County as a result of employment in the county and the payment of local fees and taxes.

Petitioner Columbia Resource Company, L.P. (CRC), has a 20-year contract with Clark County, Washington, under which it disposes of solid waste originating there. CRC uses the Finley Buttes Landfill in Morrow County as its disposal site. The operator of the Finley Buttes Landfill passes through to CRC the costs incurred for disposal, including charges made by respondent Department of Environmental Quality (DEQ).

Petitioners challenge the constitutionality of two DEQ rules that the Environmental Quality Commission (EQC) adopted in December, 1990, OAR 340-61-115(1); OAR 340-61-120(6), and the enabling statutes that established the legal standards and procedures for adoption of those rules. ORS 459.297; ORS 459.298. The portions of the rules that petitioners challenge impose a surcharge for in-state disposal of garbage generated out-of-state.[1]

In 1989, the legislature enacted Oregon Laws 1989, chapter 833, an amalgamation of several bills dealing with

---

[1] Pertinent parts of the rules provide:

"Beginning July 1, 1984, each person required to have a Solid Waste Disposal Permit shall be subject to a three-part fee consisting of a filing fee, an application processing fee and an annual compliance determination fee as listed in OAR 340-61-120. In addition, each disposal site receiving domestic solid waste shall be subject to an annual recycling program implementation fee as listed in OAR 340-61-120, and a per-ton fee on domestic solid waste as specified in section (5) of this rule. In addition, each disposal site or regional disposal site receiving solid waste generated out-of-state shall pay a surcharge as specified in section (6) of this rule." OAR 340-61-115(1).

"Each solid waste disposal site or regional solid waste disposal site that receives solid waste generated out-of-state shall submit to the Department of Environmental Quality a per-ton surcharge of $2.25. This surcharge shall apply to each ton of out-of-state solid waste received at the disposal site." OAR 340-61-120(6).

waste reduction. Section 155, codified as ORS 459.297, provides that every person who disposes of solid waste that was generated out-of-state must pay a surcharge to help meet the cost to the state of administering the solid waste program.[2] Section 156, codified as ORS 459.298, enables EQC to establish the amount of the surcharge.[3] The rules impose on the disposal site a surcharge of $2.25 per ton for out-of-state waste that the site receives. The surcharge imposed at the disposal site for waste generated within Oregon is capped at $.50 per ton. *Former* ORS 459.294(5).[4]

■      The Oregon Supreme Court has explained that, before we can reach constitutional issues under ORS 183.400,[5] we must first determine: (1) whether the agency

---

[2] ORS 459.297 provides:

"(1) Beginning on January 1, 1991, every person who disposes of solid waste generated out-of-state in a disposal site or regional disposal site shall pay a surcharge as established by the Environmental Quality Commission under ORS 459.298. The surcharge shall be in addition to any other fee charged for disposal of solid waste at the site.

"(2) The surcharge collected under this section shall be deposited in the State Treasury to the credit of an account of the Department of Environmental Quality. Such moneys are continuously appropriated to the department to meet the costs of the department in administering the solid waste program under ORS 459.005 to 459.426, 459.705 to 459.790 and 459A.005 to 459A.665."

[3] ORS 459.298 provides:

"Subject to approval by the Joint Committee on Ways and Means during the legislative sessions or the Emergency Board during the interim between sessions, the Environmental Quality Commission shall establish by rule the amount of the surcharge to be collected under ORS 459.297. The amount of the surcharge shall be based on the costs to the State of Oregon and its political subdivisions of disposing of solid waste generated out-of-state which are not otherwise paid for under the provisions of ORS 459.235 and ORS 459.297, 459.298, 459.411 to 459.417, 459A.100 to 459A.120 and sections 70 to 73, chapter 833, Oregon Laws 1989. These costs may include but need not be limited to costs incurred for:

"(1) Solid waste management;

"(2) Issuing new and renewal permits for solid waste disposal sites;

"(3) Environmental monitoring;

"(4) Ground water monitoring; and

"(5) Site closure and post-closure activities."

[4] ORS 459.294 was renumbered ORS 459A.110 in 1991. Or Laws 1991, ch 385, § 91.

[5] ORS 183.400(4) provides:

"The court shall declare the rule invalid only if it finds that the rule:

"(a) Violates constitutional provisions;

had the general authority to make that kind of rule; (2) whether the agency followed the procedures prescribed by statute or regulation; and (3) whether the substance of the rule departed from the legal standard expressed or implied in the enabling legislation or contravened some other applicable statute. *Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 565, 687 P2d 785 (1984).

> "These steps are designed to assure that the challenged action, particularly an action challenged for arguably violating constitutional rights, in fact was authorized by the state's or local government's politically accountable policy makers. Only if the action was clearly so authorized is there any reason to decide whether the state or local government has adopted a policy that the constitution forbids." 297 Or at 565.

█ █ Petitioners do not contend that the agency did not have the general authority to make rules imposing surcharges on solid waste. They also make no meritorious arguments that the substance of the rules deviated from the legal standard provided in the statute[6] or that they contravened some other applicable statute.[7] Their procedural argument is

---

"(b) Exceeds the statutory authority of the agency; or

"(c) Was adopted without compliance with applicable rulemaking procedures."

[6] Gilliam County argues that the agency improperly considered various costs to include as components of the surcharge. It cites *Kids Against the Cut v. Wage and Hour Comm.*, 41 Or App 179, 597 P2d 1264 (1979), for the proposition that we must examine DEQ's "methodology to develop" those costs to determine whether the agency "failed to act in conformance with the enabling statute." That infers too much from *Kids Against the Cut*. In that case, we held only that we may look at the record to see whether the agency made a determination on which its authority to act was predicated, not that we may consider whether the method used to reach that determination was correct.

[7] Petitioners assert in one short paragraph that EQC violated ORS 459.305 by including in the surcharge $0.05 per ton for what EQC calls "solid waste reduction activities related to reviewing and certifying out-of-state waste reduction and recycling plans." They argue that certification fees may not be "lumped into the surcharge levied on all out of state waste," because they must be "set in accordance with ORS 486.065," which they believe requires the fee to be set by a rule after a hearing. Moreover, they observe, the fee is "subject to review of the Executive Department and the prior approval of the appropriate legislative review agency." ORS 459.305(4).

Even assuming, without deciding, that ORS 459.305 is the exclusive source of authority for EQC to assess the certification fee, we see nothing in the statute that prohibits the agency from considering that fee at the same time that it considers the

that ORS 459.298 requires the agency to follow a process that violates the Oregon Constitution and that the statute in its entirety is therefore invalid, so no rules could be made under it. They argue in the alternative that, if the procedures are permissible, then the rules are invalid, because the agency did not follow those procedures. If the rules were made by a valid procedure, they argue, they are nonetheless invalid, because they impermissibly discriminate against interstate commerce in violation of the United States Constitution.

We turn first to the state law issues. *Planned Parenthood Assn. v. Dept. of Human Res., supra.* Under ORS 459.298, the amount of the surcharge is subject to approval by the Joint Committee on Ways and Means (Committee) during legislative sessions or by the Emergency Board during the interim. OWS argues that the grant of authority to the Emergency Board violates the state constitution. CRC agrees and argues that subjecting the rules to approval by the Committee is also unconstitutional. Both petitioners assert that the unconstitutional provisions render the statute unconstitutional and, therefore, that the rules promulgated under it are invalid. If the approval requirements are valid, they argue, then the rules are invalid, because EQC did not seek to obtain final approval from either authority.

■ Respondents concede, and we agree, that ORS 459.298 is unconstitutional to the extent that it subjects the surcharge determination to Emergency Board approval,

---

surcharge and nothing that requires the fee to be established by a separate rule, rather than as a component part of a more general rule. We also see nothing in ORS 468.065 (*since amended by* Or Laws 1991, ch 752, § 15) that requires the certification fee to be set by a rule after a hearing. Subsection (1) pertains only to permits issued under various sections of ORS chapters 448, 454 and 468. Subsection (2) pertains only to fees for permits issued pursuant to the specified sections that govern water and air pollution sources. Subsection (3) describes the costs that the agency may consider in determining fees for certification of hydroelectric power projects. Subsection (5) applies only to the specified sections of chapters 448, 454 and 468. Subsections (4) and (6) are the only subsections to which ORS 459.305(4) *could* refer. The former provides that DEQ may require various documents and reports to be submitted by those who apply for permits; the latter merely addresses what must be done with the fees that the DEQ collects. Neither requires a separate rule or a hearing.

We also see no merit in petitioners' second argument under ORS 459.305(4). As far as we can tell, that subsection requires nothing different from the procedure specified under ORS 459.298. Petitioners do not explain any other way that we should read it, and we decline to try to create an argument for them.

because the Board has only the powers granted to it in Article III, section 3, of the Oregon Constitution. Art IV, §§ 1, 25. Those powers do not include the power to veto EQC's surcharge rule.[8] Respondents argue, however, that the language requiring Emergency Board approval is severable from ORS 459.298, that the statute is workable without that provision and that EQC followed the correct procedure by not obtaining final approval of the Board.

■   The starting point for deciding that issue is ORS 174.040, which states the legislative preference for severability:

"It shall be considered that it is the legislative intent, in the enactment of any statute, that if any part of the statute is held unconstitutional, the remaining parts shall remain in force unless:

"(1)   The statute provides otherwise;

"(2)   The remaining parts are so essentially and inseparably connected with and dependent upon the unconstitutional part that it is apparent that the remaining parts would not have been enacted without the unconstitutional part; or

"(3)   The remaining parts, standing alone, are incomplete and incapable of being executed in accordance with the legislative intent."

Petitioners contend that Emergency Board approval is essential to the remaining parts, because without it the statute cannot be executed in accordance with legislative intent.

The bills that comprised HB 3515, which became Oregon Laws 1989, chapter 833, had been referred first to subject matter committees to consider their substance and then to the Joint Committee on Ways and Means to consider their fiscal impacts. The Joint Committee on Ways and Means, the first committee to consider HB 3515 as a whole, inserted the Emergency Board approval requirement without providing a detailed explanation for it. Petitioners rely on the history of other sections of the bill that also included Emergency Board oversight. On the basis of that history, they argue that "the overriding philosophy * * * was to maintain

---

[8] No one has raised, and we do not decide, any issue about the validity of a statutory requirement that EQC *consult* the Emergency Board, any legislative committee or legislative counsel.

strict E-Board control over fees of various agencies" and that the legislature would not have enacted the statute without that control.

The history cited by petitioners shows that members of the Committee were informed that, legally, the Emergency Board could review and comment on the surcharges, but that it did not have approval authority. During consideration of the State Fire Marshall's authority to establish a fee schedule relating to hazardous wastes,[9] a legislative committee staff member, Acuff, commented:

"Mr. Chairman, I believe that legislative counsel will tell you that the Emergency Board does not have the approval authority * * * that it is a review and comment only."

The response of the chair, Representative Hanlon, was to instruct staff to include control "to the extent authorized by law."

The history also demonstrates that inclusion of Emergency Board review was intended to permit the exertion of political, even if not legal, pressure:

"Acuff: Well, I think you're accomplishing your objective * * *. I think you're accomplishing the objective that you want now in limiting the dollars that you have in your first four decisions. You're forcing the fee structure as it is and they will come back to you and prove that [to] you either to the E-Board or to the Assembly.

"Rep. Jones: Except that * * * if [the Fire Marshall does not prove the need to the Emergency Board to increase fees] they go ahead and do it anyway.

"Acuff: I doubt that the Fire Marshall would go ahead and do it anyway.

---

[9] The quotations are from Tape Recording, Ways and Means Subcommittee on Transportation and Regulation regarding HB 3515, June 24, 1989, 155B.

| | |
|---|---|
| "Rep Hanlon: | So do I. We will be breaking for a quick lunch at 12:30 * * * half an hour or so. Up to the lounge and get some cornflakes. I would like to see the amendment. I'm not sure because I wasn't listening to the whole thing, but I think Representative Jones and I agree the amendment should be made to the fullest extent possible to control the imposition of those fees. And that means that the E-Board * * * whoever it is that's approving it in the legislature has the authority * * * that authority * * * whatever authority they have, they may, may exercise at that point. |
| "Sen. Hill: | Mr. Chairman. |
| "Rep. Hanlon: | Larry. |
| "Sen. Hill: | I'd agree. I'd ask that the committee request Sue to give us the toughest language we can have for E-Board control over the fee." |

We infer from that discussion that the legislature wanted to exercise whatever authority it could over the imposition of fees but that it understood that the Emergency Board might not have the power to overrule the agency. Nevertheless, it did not enact a nonseverability provision, as it presumably would have done had it intended to override the preference for severability contained in ORS 174.040.

With the unconstitutional provision granting approval authority to the Emergency Board omitted, the statute provides:

"Subject to approval by the Joint Committee on Ways and Means during the legislative sessions, the Environmental Quality Commission shall establish by rule the amount of the surcharge to be collected under ORS 459.297."

The statute, so read, is restrictive in that it limits the approval requirement to when the legislature is in session. That does not render the statute unworkable. We conclude that the unconstitutional provision relating to Emergency Board authority is severable.

Read that way, however, the statute still requires EQC to submit the surcharge rules to the Committee for approval. CRC argues that that provision also violates the Oregon Constitution. It urges us to adopt the reasoning of *INS v. Chadha*, 462 US 919, 103 S Ct 2764, 77 L Ed 2d 317 (1983), which held unconstitutional a provision of the Immigration and Nationality Act of 1952, 8 USC §§ 1101 *et seq*, that purportedly authorized a one-house legislative veto of the Attorney General's determination that a particular deportable alien should not be deported. 8 USC § 1254(c)(2). Respondents do not directly respond to those arguments but, in the course of explaining that the Emergency Board provision is severable, they conclude that "without the offending provision the statute simply provides that the agency shall set the rates." We assume, however, that respondents did not intend that to be an affirmative concession that the provision subjecting the rules to the approval of the Committee is also unconstitutional.

CRC argues that, even if approval of the surcharge is a legislative act,[10] the Committee cannot do it, because all bills must be approved by a majority of each house, Or Const, Art IV, § 25, and presented to the governor for signature. Or Const, Art V, § 15b.[11] The plain language of the statute provides that the rules are subject to approval of the *Committee*; it does not provide that the rules are subject to approval of the Legislative Assembly. The legislature has required approval of the Emergency Board or the "Legislative Assembly" before agency action can take effect in other contexts, but it did not use such language here. *See, e.g.*, ORS

---

[10] Respondents concede that, if approval of the surcharge rule is an executive act, then only the Executive Branch may approve. Or Const, Art III, § 1. They also do not argue that any part of the legislature could approve the surcharge, if approval is a judicial act.

[11] Article IV, section 25, provides:

"A majority of all the members elected to each House shall be necessary to pass every bill, or Joint resolution; and all bills, and Joint resolutions so passed, shall be signed by the presiding officers of the respective houses."

Article V, section 15b(1), provides:

"Every bill which shall have passed the Legislative Assembly shall, before it becomes a law, be presented to the Governor; if the Governor approve, the Governor shall sign it; but if not, the Governor shall return it with written objections to that house in which it shall have originated, which house shall enter the objections at large upon the journal and proceed to reconsider it."

341.565(4); ORS 537.805(4)(a).[12] Although the legislature has the undoubted authority to enact laws establishing charges, nowhere does the legislative history suggest that anyone thought that the provision required any action by the Legislative Assembly beyond review by the Committee. We therefore read the words "Joint Committee on Ways and Means" to signify that the legislature intended the approval process to be completed by the Committee without further legislative process.

■ If the statute were given effect as written, it would constitute a command by the legislature ordering EQC to propose legislation to be enacted by the Committee. Respondents concede that the power to enact or repeal laws is vested solely in the Legislative Assembly and that that power cannot be delegated, even to a group of its own members. *See Marr v. Fisher et al.*, 182 Or 383, 388, 187 P2d 966 (1947); *Van Winkle v. Fred Meyer, Inc.*, 151 Or 455, 49 P2d 1140 (1935); *see also* 31 Op Att'y Gen 161 (Or 1962-64). The Committee is composed of only 16 legislators, 8 from each house, ORS 171.555, and therefore could not constitute "[a] majority of all the members elected to each House." Or Const, Art IV, § 25. No laws can constitutionally be enacted by the process described in the statute.[13]

■ CRC argues that the approval provision is not severable from the statute for all the same reasons that Emergency Board approval is not severable. The starting point again is ORS 174.040. Because the legislature has expressed a strong general preference in favor of severability, we can find the

---

[12] We note that several other 1989 enabling statutes that contained language requiring Committee or Emergency Board approval were amended in 1991. Those statutes now contain language similar to that in ORS 448.410(1)(d), which governs the adoption of fees to certify persons qualified to supervise the operation of sewage treatment works:

"Subject to the prior approval of the Executive Department and a report to the Emergency Board prior to adopting the fee, * * *. The fees established * * * shall be within the budget authorized by the Legislative Assembly as that budget may be modified by the Emergency Board."

*See also* ORS 448.450(1)(d); ORS 453.408(3); ORS 465.385(2)(b).

[13] We also note that, even if we were to construe the language to imply that the Committee would submit EQC's proposal to the Legislative Assembly, the statute would still establish a defective process, because all bills must originate in one of the houses and revenue bills must originate in the House of Representatives. Or Const, Art IV, § 18.

Committee approval requirement not severable only if (1) it is apparent that the legislature would not have enacted the statute without that provision or (2) the resulting parts of the statute would be incomplete and incapable of being executed in accordance with legislative intent.

ORS chapter 459 contains over 40 pages devoted to the control of solid waste. The legislature found that "[t]here is a shortage of appropriate sites for landfills in Oregon," ORS 459.015(1)(c), and:

> "It is in the best interests of the people of Oregon to extend the useful life of existing solid waste disposal sites by encouraging recycling and reuse of materials whenever recycling is economically feasible, and by requiring solid waste to undergo volume reduction through recycling and reuse measures *before disposal in landfills* to the maximum extent feasible. Implementation of recycling and reuse measures will not only increase the useful life of solid waste disposal sites, but also decrease the potential public health and safety impacts associated with landfill operation." ORS 459.015(1)(d) (*since amended by* Or Laws 1991, ch 385, § 7). (Emphasis supplied.)

The legislative scheme was intended to establish a comprehensive system of regulation that provides for broad participation and cooperation among local governments and state agencies, "reserving to the state those functions necessary to assure effective programs, cooperation among local government units and coordination of solid waste management programs throughout the state." ORS 459.015(2)(c) (*since amended by* Or Laws 1991, ch 385, § 7). It delegated to EQC and DEQ the authority to adopt and enforce rules in order to implement and assure the effectiveness of the extensive regulatory plan. *See* ORS 459.025; ORS 459.045; ORS 459.376; ORS 459.385.

Chapter 459 contains a plethora of sections authorizing EQC, DEQ and local governments to impose fees and charges to recover costs at each step in the solid waste control program.[14] As in the statutes at issue here, almost every

---

[14] Those include: ORS 459.053(9) (DEQ—fees to repay department costs and fund operation and maintenance of a department owned landfill disposal site); ORS 459.125(1)(d) (Marion County—fees to control and regulate disposal, transfer and resource recovery sites located in the county); *former* ORS 459.170(1)(g) (renum-

delegation of authority to charge a fee is accompanied by an explanation of how the fee is to be calculated and how the funds collected are to be used. *See, e.g., former* ORS 459.170(2) (renumbered 459A.025(2) in 1991); *former* ORS 459.200(8) (renumbered 459A.085 in 1991); ORS 459.235(2); ORS 459.236(5); ORS 459.284; ORS 459.335. That careful structuring of fees demonstrates that the legislature wanted to ensure that the costs of each protective activity would be borne by those who had created the need for it. It clearly wished to avoid spreading among all Oregonians the costs of mitigating environmental risks that they did not create.

Although the Committee was reluctant to delegate final authority to EQC to establish the surcharge, that reluctance was insufficient to motivate it to include in the statute a non-severability clause. *See, e.g., INS v. Chadha, supra,* 462 US at 932. From that fact, the extensiveness of the regulatory scheme, the detail with which the authority was delegated and the nature of the overall fee structure that the chapter creates, we conclude that the legislature would have enacted ORS 459.297 and ORS 459.298 even if it had known that neither the Committee nor the Emergency Board could have the power to veto the resulting rules.[15] The language that remains after both approval provisions are deleted is still a

---

bered 459A.025 in 1991) (EQC — fees to carry out various provisions of the chapter); *former* ORS 459.200(7)(b) (renumbered 459A.085 in 1991) (cities and counties — fees from persons holding collection service franchises); ORS 459.235 (fee for permit to operate a disposal site); ORS 459.236 (permit fees imposed on all disposal sites to pay for removal or remediation of hazardous substances); ORS 459.284 (permit fees that are imposed on governmental unit that has a disposal site to be used for rehabilitation and enhancement of the area around the site); *former* ORS 459.294 (renumbered 495A.110 and amended by Or Laws 1991, ch 385, § 91) and *former* ORS 459.295 (renumbered 459A.120 in 1991) (EQC — schedule of fees for receipt of domestic solid waste; to be used to reduce environmental risks at waste disposal sites); ORS 459.305(4) (fee for certification that a governmental unit has implemented recycling opportunity provisions); ORS 459.310 (local governments can impose surcharge on solid waste received at regional disposal sites); ORS 459.311 (local governments must charge for remedial action or removal at solid waste disposal site); ORS 459.335 (user fees set by metropolitan service district); and ORS 459.509-ORS 459.765 (fees for sale of new tires and disposal of waste tires).

[15] Even without the power to veto administrative rules, the legislature retains oversight by virtue of ORS 171.572, which provides:

"The Legislative Counsel shall review administrative rules adopted or proposed for adoption by state agencies. Such review shall be in accordance with the provisions of ORS 183.710 to 183.725."

workable statute that contains clear standards for EQC to follow.

After EQC drafted the rule that established the fee, it submitted it to the Emergency Board. The Board instructed EQC that the fee had been set too high for reasons that we need not examine. EQC then redrafted the rule to require a slightly lower fee. It did not, however, submit the amended rule to the Emergency Board or to the Committee for final approval. Strictly speaking, EQC did not follow the procedure prescribed in the statute. The rule is not invalid on that ground, however, because the portion of the statutory procedure that the agency failed to follow is unconstitutional. It would be perverse, indeed, to hold a rule invalid on the ground that the agency did not follow a constitutionally impermissible procedure. No one has otherwise challenged the validity of the procedure that EQC actually employed.

Petitioners contend that OAR 340-61-115(1) and OAR 340-61-120(6) violate the Commerce Clause, Article I, section 8, clause 3, of the United States Constitution[16] by imposing a higher surcharge for garbage received from out-of-state haulers than that received from in-state haulers.[17]

The Commerce Clause grants Congress the power to regulate commerce among the states. Unless Congress precludes it, states may make laws that affect persons engaged in interstate commerce. However, states cannot enact laws that discriminate against articles of interstate commerce "unless there is some reason, apart from their origin, to treat them

---

[16] Article I, section 8, clause 3, of the United States Constitution provides:

"The Congress shall have Power * * *

"* * * * *

"To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

[17] The rules require Oregon landfill operators to remit the surcharge to DEQ, but do not require them to exact the surcharge from out-of-state haulers. Accordingly, a landfill operator can pass the surcharge on to in-state as well as out-of-state haulers in the form of uniformly increased dumping fees. Nevertheless, because it is interstate commerce that gives rise to the obligation to pay the surcharge, the rules are subject to scrutiny under the Commerce Clause. *See Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Nat'l Res.*, ___ US ___, 112 S Ct 2019, 119 L Ed 2d 139 (1992); *Evansville Airport v. Delta Airlines*, 405 US 707, 714, 92 S Ct 1349, 31 L Ed 2d 620 (1972); *Pickard v. Pullman Southern Car Co.*, 117 US 34, 6 S Ct 635, 29 L Ed 785 (1886).

differently." *City of Philadelphia v. New Jersey*, 437 US 617, 627, 98 S Ct 2531, 57 L Ed 2d 475 (1978); *see also Chemical Waste Management, Inc. v. Hunt*, ___ US ___, 112 S Ct 2009, 119 L Ed 2d 121 (1992); *Fort Gratiot Sanitary Landfill, Inc., v. Michigan Dept. Nat'l Res., supra*, n 17; *New Energy Co. of Indiana v. Limbach*, 486 US 269, 273, 108 S Ct 1803, 100 L Ed 2d 302 (1988). States cannot benefit in-state interests by burdening out-of-state interests. *New Energy Co. of Indiana v. Limbach, supra*, 486 US at 273; *see also Wyoming v. Oklahoma*, ___ US ___, 112 S Ct 789, 800, 117 L Ed 2d 1 (1992).

■ The rules at issue here, by the express language of ORS 459.298, exact a compensatory fee for specific costs incurred by the state. They exact a per-ton surcharge on landfill operators who accept refuse from out-of-state haulers. ORS 459.297 provides that those funds are appropriated to DEQ to meet the costs that it incurs in administering the solid waste program. ORS 459.298 provides that the amount of the surcharge must be based on the costs to the state and its political subdivisions of disposing of solid waste generated out-of-state. Those may include, but are not limited to, costs associated with solid waste management, permit issuance, environmental monitoring, ground water monitoring and site closure. They may not include costs that are paid under other provisions in the chapter. The rules implement those statutory directives.

■ Laws that impose compensatory fees[18] are

"not a burden upon, or regulation of, interstate commerce in violation of the commerce clause of the Constitution. A law exhibiting the intent to impose a compensatory fee for such a

---

[18] A compensatory fee is not the same thing as a "compensatory tax," which is a general revenue measure that is intended to equalize the tax burden between substantially similar interstate and intrastate transactions. The classic example is a use tax imposed on goods purchased out of state that is equivalent to the sales tax that would have been generated had those goods been purchased in state. *See Henneford v. Silas Mason Co.*, 300 US 577, 57 S Ct 524, 81 L Ed 814 (1937). Such taxes permit an individual faced with the choice of an in-state or out-of-state purchase to make that choice without regard to the tax consequences. *Boston Stock Exchange v. State Tax Comm'n*, 429 US 318, 330, 97 S Ct 599, 50 L Ed 2d 514 (1977). Accordingly, when a state enacts a valid compensatory tax, it does not discriminate against interstate commerce. *Complete Auto Transit, Inc. v. Brady*, 430 US 274, 97 S Ct 1076, 51 L Ed 2d 326 (1977); *see also Maryland v. Louisiana*, 451 US 725, 759-60, 101 S Ct 2114, 68 L Ed 2d 576 (1981).

legitimate purpose is prima facie reasonable." *Great Northern Ry. Co. v. State of Washington*, 300 US 154, 160, 57 S Ct 397, 81 L Ed 573 (1937). (Footnotes omitted.)

*See also Commonwealth Edison Co. v. Montana*, 453 US 609, 622 n 12, 101 S Ct 2946, 69 L Ed 2d 884 (1981). When that kind of law is challenged on Commerce Clause grounds, the challenger has the burden to show that the fee is excessive for the purpose for which it is collected, *Clark v. Paul Gray, Inc.*, 306 US 583, 599, 59 S Ct 744, 83 L Ed 1001 (1939), or that "there is no sufficient relation between the measure employed and the extent or manner of use" of the state provided service. *Interstate Transit, Inc. v. Lindsey*, 283 US 183, 190, 51 S Ct 380, 75 L Ed 953 (1931).[19]

In *Interstate Busses Corp. v. Blodgett*, 276 US 245, 48 S Ct 230, 72 L Ed 551 (1928), a state law had assessed a per-mile user fee on busses engaged in interstate commerce but did not assess that fee on those engaged in intrastate commerce. The Court first recognized that a state may impose a reasonable charge for the use of the facilities that it

---

[19] Petitioners argue that we should apply the reasoning in a number of cases that address discriminatory health and general welfare laws and general revenue measures. Regulations that control conduct to protect some aspect of the health or general welfare of a state's citizens are valid when preservation of health or welfare is the law's true purpose and the means chosen to achieve that objective does not unduly burden interstate commerce. *Maine v. Taylor*, 477 US 131, 106 S Ct 2440, 91 L Ed 2d 110 (1986); *Pike v. Bruce Church, Inc.*, 397 US 137, 142, 90 S Ct 844, 25 L Ed 2d 174 (1970). However, if the actual purpose or effect of a health or welfare regulation is economic or resource protectionism, the law may be invalid. *See, e.g., Wyoming v. Oklahoma, supra*; *Hunt v. Washington State Apple Advertising Comm.*, 432 US 333, 97 S Ct 2434, 53 L Ed 2d 383 (1977); *Dean Milk Co. v. City of Madison*, 340 US 349, 71 S Ct 295, 95 L Ed 329 (1951); *compare Maine v. Taylor, supra*, with *City of Philadelphia v. New Jersey, supra*. General revenue measures are taxes imposed to compensate the state for "providing police and fire protection, the benefit of a trained work force, and the advantages of a civilized society." *Commonwealth Edison Co. v. Montana, supra*, 453 US at 624. (Citations and internal quotations omitted.) A state can impose such a tax on those engaged in interstate commerce if it

> "is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to services provided by the State." *Complete Auto Transit, Inc. v. Brady, supra*, 430 US at 274.

When a law satisfies that standard, out-of-state interests pay their fair share of the costs of running the state.

The statutes and rules here neither regulate conduct nor impose taxes that support state government generally. The fees are based on and applied to the provision of a narrow range of state services that are directly connected to the activity on which the fees are imposed.

provides to those engaged in interstate commerce, roads, in that case. It then determined, from a facial review of the statutory scheme, that the funds generated were dedicated to financing those facilities. The Court sustained the validity of the fee, because the party challenging it failed to show that "the aggregate charge [bore] no reasonable relation to the privilege granted." 276 US at 252.

■ In *Clark v. Paul Gray, Inc., supra*, the state had exacted a "caravaning" fee for each automobile "operated on its own wheels, or in tow of a motor vehicle, for the purpose of selling or offering the same for sale * * * within or without [the] State." 306 US at 586. (Citation omitted.) The purpose of the fee was

> "to reimburse the State for expense [*sic*] incurred in administering police regulations pertaining to the operation of vehicles moved pursuant to such permits and to public safety upon the highways as affected by such operation." *306 US at 586. (Citation omitted.)*

Because the law exempted cars moved exclusively within one of two zones that were roughly defined as the northern and southern halves of the state, the plaintiffs claimed that it unlawfully discriminated against interstate commerce. The Court disagreed. It first determined that the distinction that the state had made between intrazone and interzone traffic was permissible, because the state incurred a distinct burden by managing and facilitating the latter form of traffic and the intrazone traffic was already paying its fair share of costs of that commerce. The Court then recognized that the fees would offend the Commerce Clause if the plaintiffs showed that they were "excessive for the declared purposes." 306 US at 599. Because the fees did not appear, on their face, to be manifestly disproportionate to the services rendered, and the plaintiffs failed to present any other evidence of disproportionality, the Court sustained the validity of the fees.

EQC's rules exact a compensatory fee for the distinct burden that the state incurs to regulate and facilitate disposal of out-of-state waste. Unlike the Michigan plan at issue in *Chemical Waste Management, Inc. v. Hunt, supra*, the rules impose a surcharge on in-state *and* out-of-state waste for the state services. The state might nevertheless be unlawfully discriminating if there is no reason, apart from its origin, to

charge more for its services to manage and regulate out-of-state waste than it charges to manage and regulate in-state waste. The state, however, appears to have a reason apart from origin *per se* to treat out-of-state waste differently. It first encounters any out-of-state waste at the disposal site. In contrast, by the time in-state waste reaches the disposal site, it has already been subjected to state and local regulations and fees that are designed to reduce its volume and alter its character in order to limit the risks associated with dumping it on the ground. *See* n 14, *supra*. We cannot discern, from a facial review of the rules and legislation whether, in the aggregate, in-state garbage ultimately "pays" all of the costs that the state and its political subdivisions incur to manage and regulate its disposal. However, it does show that EQC is expressly forbidden to impose fees on out-of-state waste that exceed the costs of management of that waste. The legislature has made abundantly clear that it intends only to make "out-of-state generators pay their 'fair share' of the costs" and no more. *Chemical Waste Management, Inc. v. Hunt, supra*, ____ US at ____ n 9. Therefore, before we could say that the rules are unconstitutional, petitioners would have to show that the fees are excessive for the purposes for which they are collected or that there is no sufficient relation between the measure employed and the extent or manner of use of the state provided service.

■■■ Petitioners brought this challenge under ORS 183.400, which provides, in part:

"(3) Judicial review of a rule shall be limited to an examination of:

"(a) The rule under review;

"(b) The statutory provisions authorizing the rule; and

"(c) Copies of all documents necessary to demonstrate compliance with applicable rulemaking procedures."

A facial review of the enabling legislation and the rules does not show that the fees are either excessive or unrelated to the state provided service. ORS 183.400(3) does not permit us to consider the evidence that petitioners would have to produce to show that the fees are, nevertheless, manifestly disproportionate to the costs incurred by the state to manage and facilitate disposal of out-of-state waste. That kind of evidence

can be considered only on review of an order in a contested case. ORS 183.482.

Rules held valid.